## CHARLIE MILLER v. STATE.

No. A-2397.    Opinion Filed February 26, 1917.

(163 Pac. 131.)

1. **CRIMINAL LAW—Trial—Conviction.** The general rule is that when a denfendant is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone.

2. **EVIDENCE—Other Offenses—In General.** Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: First, motive; second, intent; third, the absence of mistake or accident; fourth, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; fifth, the identity of the person charged with the commission of the crime on trial.

3. **SAME—Robbery.** Evidence of another separate and distinct robbery, committed the preceding night, by the defendant upon another person, in the same neighborhood, in much the same way, is not admissible in evidence 'against one who is being tried for robbing a pedestrian on the street in a city by pointing a pistol at him. Such is not an exception to the rule, that evidence of matters other than those charged in the information are admissible. It is only when the testimony as to the separate offense will have some tendency to prove the offense charged in the information that it is admissble. It must, therefore, have some logical connection with the offense charged.

4. **EVIDENCE—Self-Disserving Statements—Duress.** When a prisoner is compelled by duress to make self-disserving statements, such statements cannot be put in evidence against him.

5. **SAME—Statements of Prisoner—Voluntary Character.** To render statements made by a prisoner admissible, they must be entirely free and voluntary; that is, must not be absttracted by any sort of threats or violence, nor obtained by any direct or implied promises. It is not important to determine whether they amount to a confession of guilt, or merely declarations of fact tending to show guilt.

*Appeal from District Court, Muskogee County.*
*Fred P. Branson, Judge.*

Charlie Miller was convicted of robbery, and he appeals. Reversed and remanded.

The plaintiff in error, Charlie Miller, was tried and convicted on an information charging him with having robbed one W. J. Orall of 42 cents, and he was sentenced to imprisonment in the penitentiary for the term of ten years. He appealed by filing in this court on February 9, 1915, a petition in error with case-made. The evidence in the case, briefly stated, is as follows:

W. J. Orall testified that about 11:30, Sunday night, June 28, 1914, as he was on his way home, he met a man in the 400 block on East Broadway, Muskogee, who asked for a match, and then threw an automatic in his face, and said, "Throw up your hands," and took from him 42 cents, consisting of a quarter, a dime, a nickel, and two pennies; that he then went on home and telephoned the police station, and about 20 minutes later the officers appeared with the defendant, and he told them the man who robbed him "was just about the same size"; that they showed him a battered penny which he identified as one of the pennies taken from him by the robber; that he did not remember where he got the penny.

Ed Davidson testified that in answer to a telephone call saying there had been a holdup on East Broadway, he and Clark Compton left the police station in a car for the place named, and at the corner of D. and Okmulgee streets they picked up the defendant, and on searching him found 42 cents in money and a gun.

D. C. Hughes testified that they put the defendant in the patrol and took him to the station; that he put

the 42 cents in an envelope, and sealed it (he produced the pistol and the envelope) ; that the defendant made a number of statements, first saying that he was from Joplin, Mo., where he had worked in the coal mines eight or nine months and that a week before he left there and came to Muskogee; that witness then asked him where he spent the evening and he said he went to the city park early in the evening; that later, after taking him out the second time, he said that he had been to a show on Broadway, and went to the park after the show was out; that later on he said that he had not been working at Joplin, but had been in Kansas City, and came by way of Joplin, and there bought the gun; that witness asked him what time he left Joplin, and he said, "Friday, and got into Vinita Saturday evening, and rode the blind from Vinita to Wagoner"; that witness asked him why he did not buy a ticket and he said, "I only had 40 cents and wanted to save my money"; that witness asked him where he got the pennies and he said he did not know; that he first said that his name was Webb, and finally said his name was Charlie Moore, and that he had worked in a restaurant on Second street, and had a brother working at the Katy Hotel.

On cross-examination Hughes testified in part as follows:

"Q. Now, what did you do when you got him to the station? A. We searched him and taken him in the room and talked to him. Q. Where? A. The room that Compton and Robbins have—his private room. Q. What did you do there? A. Talked to him, and asked him where he had been, and got the different statements. Q. Mr. Hughes, were you in the room all the time Clark Compton and Robbins was in there? A. No, sir. Q. Didn't you see the officers strike this defendant while you were

there? A. No, sir. Q. Didn't you help to punish him in there physically? A. No, sir. Q. To refresh your memory, didn't you get hold of his arm and twist it up so he suffered pain? A. No, sir. I only taken hold of his arm one time, and got him in the patrol, and he said something—and I said 'You are the dirty son of a bitch that has been doing this work,' and he throwed up his arm and said, 'Don't you call me a son of a bitch,' and then I caught his arm and gave him a half Nelson. Q. You think the officers should talk that way? A. I don't know. That depends on what kind of a person you are talking to. Q. So you tell this jury that you said to him that 'You are the God damn son of a bitch that has been doing this robbing'? A. That is the statement I made. I don't know whether I said 'God damn'; I believe I said 'son of a bitch.' Q. You saw no one strike him? A. No, sir. Q. You were not there all the time? A. No, sir; I was not."

Earl Smith testified that he saw the defendant on Saturday night preceding the Sunday night that Mr. Orall was robbed on Dayton street. Against the objections of the defendant he was permitted to testify as follows:

"When I saw him he was standing up right by the shrubbery and under a catalpa tree on the south side of the high school. Q. What did he do? A. He threw a gun on me and told me to put my hands up. Q. What part of the body did he point to? A. Just above the breast here; right middle ways. Q. Did you throw up your hands? A. Well, at first I told him I had only about 30 cents, if you want that I will give it to you, and he said, 'Put them up,' and I put them up. I turned around, and he walked on behind me and held his gun on me. Q. What kind of a gun did he have? A. Automatic, I judge—about a 32 or 38 in size. Q. Did he take your money? A. Yes, sir. Q. How much? A. A dollar—95 cents or a dollar, or something. Q. After that what did he do? A. Told me to go on down the

street. Q. Did you go? A. Yes, sir; I went. I stopped when I got six or eight steps, and saw that he had left my watch hanging on me, and I turned around and said, 'Much obliged, old boy, for leaving me my watch, and he told me to go on down the street, and if I looked back again he would shoot my behind off."

Smith testified that he had looked at the defendant on Sunday night following and again on the day of the trial, and he was positive that the defendant was the man that robbed him.

As a witness in his own behalf Charlie Miller testified that he was 19 years of age; lived with his parents at Westville, Okla.; that he had lived in Muskogee, and returned there the last time on Sunday morning, the 28th day of June; that he left Joplin the Thursday before and went to Neosho, Mo.; left there Friday night; arrived at Afton Saturday morning; went from there to Vinita; left there Saturday night, riding on top of a coach to Wagoner; was put off at Wagoner about 1 o'clock Sunday morning, and caught a freight train to Muskogee; had breakfast at Jim Hallett's restaurant; Hallett was an old acquaintance and in their conversation he told him that he only had 85 cents; went to the Yale show that evening; and then went to the city park, expecting to find his brother there; that returning from the park the officers drove up in an automobile, arrested him, and took him to the police station and took him into a room, where one officer got him by the hair of the head and another by the legs, and they said, "Now, didn't you do it?" and he said, "No"; that they did this about a dozen times, and hit him with their fists, trying to make him say that he was the fellow that held the young man up, and every time he said that he did not do it they hit him.

Jim Hallett testified that he conducted a restaurant in Muskogee for five years; knew the defendant about three years; saw him Sunday morning, June 28, at his place; that he paid 20 cents for his breakfast with a half dollar, and he gave him the change.

On rebuttal Mrs. Ella Everett testified that she knew the defendant, and saw him in Muskogee about the 18th of June.

R. H. Mauss testified that he saw the defendant near the Muskogee High School the night Earl Smith was robbed.

*M. G. Bailey,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the state.

DOYLE, P. J. (after stating the facts as above). Upon an information duly filed in the district court of Muskogee county, charging him with having robbed W. J. Orall of 42 cents in money, plaintiff in error was tried and convicted of robbery in the first degree. The jury failed to agree upon the punishment. Motion for new trial was duly filed. On July 14, 1914, the court overruled the motion and pronounced judgment and sentenced the defendant to imprisonment for 25 years. Thereupon a motion to vacate said judgment and to modify said sentence was filed, which motion was sustained. On August 10th the court again rendered judgment and sentenced the defendant to serve a term of ten years' imprisonment in the penitentiary, and he has appealed to this court. It appears from the record that when the case was called for trial, it having been made to appear that the defendant was destitute of means to employ counsel, the court appointed Mr. Bailey to defend him, and when the judgment appealed from was

rendered the court ordered the reporter to furnish a transcript of the testimony without expense to the defendant. The case was filed in this court as that of a poor person. No brief has been filed on behalf of the defendant, and we have not been favored with an oral argument in his behalf.

An examination of the record leads to the conclusion that the judgment of conviction ought not be permitted to stand, and this altogether without regard to the merits of the question of guilt or innocence of the defendant. To affirm the judgment would do violence to well-settled and recognized rules of practice and procedure in criminal prosecutions, and would be in violation of our conception of the rights of every individual charged with crime.

The transcript of the testimony in the case discloses that over the objections of counsel for the defendant the court permitted witness Earl Smith to testify, not only as to seeing the defendant in the city of Muskogee the night preceding the night of the robbery, but also permitted this witness to testify that the defendant at that time assaulted him with a gun and robbed him. The robbery as testified to by witness Smith was a separate and distinct offense, entirely disconnected with the offense charged, and the question presented is, Does this testimony of a separate offense come within any of the well-known exceptions to the general rule in criminal cases, that when a defendant is put upon trial for one offense he is to be convicted, if at all, by evidence which shows he is guilty of that offense alone? This rule is tersely stated by Mr. Bishop, who says:

"The state cannot prove against a defendant any crime not alleged, either as foundation for a separate punishment, or as aiding the proofs that he is guilty of

the one charged, even though he has put his character in issue." (2 Bishop's New Crim. Proc. sec. 1120.)

Commenting on this rule in the case of *People v. Molineux*, 36 Misc. Rep. 435, 73 N. Y. Supp. 806; *Id.*, 168 N. Y. 291, 61 N. E. 293, 62 L. R A. 193, the Court of Appeals says:

"This rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurisprudence from all others, at least from the birth of Magna Charta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt. This rule, and the reasons upon which it rests, are so familiar to every student of our law that they need be referred to for no other purpose than to point out the exceptions thereto."

The exceptions as stated in the opinion are as follows:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: (1) Motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial." (Wharton on Crim. Ev. (9th Ed.) sec. 48; Underhill on Ev. sec. 58; Abbott's Trial Brief, Crim. Trials, sec. 598.)

See, also, *State v. Rule*, 11 Okla. Cr. 237, 144 Pac. 807.

In the case of *Koontz v. State*, 10 Okla. Cr. 553, 139 Pac. 842, Ann. Cas. 1916A, 689, which was a robbery

case. the court permitted an accomplice witness to testify in reference to conspiracy to commit another robbery entirely disconnected with the offense with which the defendant was charged, and it was held that the evidence objected to did not fall within any exception to the general rule. In that case it was said:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the crime charged."

To bring a case within this exception to the general rule, there must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of the general scheme or plan.

Mr. Underhill in his work on Criminal Evidence (section 88), thus states this exception to the general rule:

"No separate and isolated crime can be given in evidence. In order that one crime may be relevant as evidence of another, the two must be connected as parts of a general and composite scheme or plan. Thus the movements of the accused prior to the instant of the crime are always relevant to show that he was making preparations to commit it. Hence, on a trial for homicide, it is permissible to prove that the accused killed another person during the time he was preparing for or was in the act of committing the homicide for which he is on trial. And, generally, when several similar crimes occur near each other, either in time or locality, as, for example, several burglaries or incendiary fires upon the same night, it is relevant to show that the accused, being present at one of them, was present at the other if the crimes seem

to be connected. Some connection between the crimes must be shown to have existed in fact and in the mind of the actor, uniting them for the accomplishment of a common purpose, before such evidence can be received. This connection must clearly appear from the evidence. Whether any connection exists is a judicial question. If the court does not clearly perceive it, the accused should be given the benefit of the doubt and the evidence rejected. The minds of the jurors must not be poisoned and prejudiced by receiving evidence of this irrelevant and dangerous description."

The court in its charge to the jury stated that the evidence tending to show that Earl Smith was robbed by some one on the night previous to the alleged robbery was admitted solely for the purpose of identification.

In the case of *People v. Molineux, supra,* it was said:

"Another exception to the general rule is that, when the evidence of an extraneous crime tends to identify the person who committed it as the same person who committed the crime charged in the indictment, it is admissible. There are not many reported cases in which this exception seems to have been affirmatively applied. A far larger number of cases, while distinctly recognizing its existence, have held it inapplicable to the particular facts then before the court. The reason for this is obvious. In the nature of things, there cannot be many cases where evidence of separate and distinct crimes, with no unity or connection of motive, intent, or plan, will serve to legally identify the person who committed one as the same person who is guilty of the other. The very fact that it is much easier to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime proves the dangerous tendency of such evidence to convict, not upon the evidence of the crime charged, but upon the super-added evidence of the previous crime. Hence our courts have been proverbially careful to subject such evidence

to the most rigid scrutiny, and have invariably excluded it in cases where its relevancy and competency was not clearly shown. As was said in *People v. Sharp*, 107 N. Y. 471 [14 N. E. 345, 1 Am. St. Rep. 851], such evidence 'tends necessarily and directly to load the prisoner down with separate and distinct charges of past crime, which it cannot be supposed he is or will be in proper condition to meet or explain, and which necessarily tend to very gravely prejudice him in the minds of the jury upon the question of his guilt or innocence.' Such evidence gives opportunity for the conviction of an accused person upon mere prejudice, instead of by evidence showing the actual commission of the crime for which a defendant is on trial. It compels a defendant to meet an accusation not charged in the indictment, which he might successfully refute if given the opportunity to do so unembarrassed by other issues." ·

The mere fact that the crime charged in the information and the crime testified to by the witness Smith were similar in the method and the means employed in their execution does not serve to identify the defendant as the man who robbed Orall. There was no such intimate connection between the two crimes that, in proving the one, the evidence necessarily tended to prove the other. Such proof in a doubtful case might turn the scales against the defendant, but the law does not permit it, and it would be dangerous to' subvert the rule, upon the vague theory that it identifies the defendant as the person who committed the offense charged. The only testimony of witness Earl Smith which was competent and admissible in this case is that part, and that part alone, in which he states that he saw the defendant in Muskogee on the night preceding the robbery of Orall. As to his testimony detailing the facts constituting another robbery, it was clearly incompetent, and its admission

was necessarily prejudicial to the defendant, because he was only required to meet the charge of robbery in the information, and he is not presumed to know that he would have to meet and repel testimony as to another separate and distinct offense.

The next assignment of error is that the court erred in admitting the testimony of the witness Hughes. This witness testified as to statements made by the defendant to him and other police officers. On his cross-examination he frankly stated that he called the defendant a vile name, and caught him by the arm "and gave him a half Nelson."

As a witness in his own behalf the defendant stated that:

"One officer took him by the hair of the head, another by the legs and they pulled him up and down about a dozen times and hit him with their fists each time trying to make him say that he was the fellow that held the young man up."

These officers did not testify, and in this respect the testimony of the defendant stands undisputed. It is elementary law that such statement must be entirely free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, in order to be admissible. The genius of our free institutions requires that admissions of the accused shall not be used against him, unless made voluntarily.

In the case of *Berry v. State,* 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849, it is said:

"Primarily there are two facts which render a confession inadmissible as evidence: First, that it was obtained under any form of compulsion, so that to receive

it in evidence would violate the defendant's constitutional privilege against self-incrimination; and second, that it was made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness."

It is not important to determine whether the statements in question amount to a confession of guilt, or merely a declaration of facts tending to show guilt, for, as said in Greenleaf on Evidence:

"The law excludes not only direct confessions, but any other declaration tending to implicate a prisoner in the crime charged, even though in terms it is an accusation of another or a refusal to confess."

Says Wharton:

"Not only is it an indictable offense to apply torture to another for the purpose of extorting a confession; but all confessions so induced will be rejected, if offered to prove a case of guilt. And even when violence is not used, the mere threat to apply it in any shape works a similar exclusion." (Wharton Crim. Ev. [9th Ed.] sec. 646.)

The foregoing we think is a sufficient exposition of the law on the question as it arises in this case. The proceedings shown by the testimony in this case cannot be too strongly denounced. They violate every principle of law, reason, humanity, and personal right. They restore the barbarity of ancient and medieval methods. They obstruct, instead of advance, the proper ascertainment of truth. It is far from the duty of an officer to extort confession by punishment. On the contrary, he should warn his prisoner that every statement he may choose to make may be used against him on his trial.

Other questions are presented by the record, but the two we have discussed are sufficient for the disposal of

this case. For the errors pointed out, the judgment of the district court is reversed, and the cause remanded. The warden of the penitentiary will surrender the defendant to the sheriff of Muskogee county, who will hold him in custody until he shall be discharged or his custody changed by due course of law.

ARMSTRONG and BRETT, JJ., concur.