HERMAN WOODRUFF v. STATE.

No. A-10015. April 23, 1942.

(125 P. 2d 211.)

W. H. Cooper, of Anadarko, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

DOYLE, J. This appeal is from a judgment of conviction, rendered on the verdict of a jury finding Herman Woodruff, "the defendant, guilty of attempt to rape as charged, and fixed his punishment at confinement in the penitentiary for one year," alleged in the information to have been committed in Caddo county, on the 17th day of May, 1940, on Dorothy Hamilton, a female person of the age of 13 years, and not the wife of the said defendant.

The record shows that upon the defendant's applica-

tion for a transcript of the proceedings and the testimony taken upon the trial, the court ordered and directed that the same be furnished to the defendant without cost to him, and the petition in error with case-made was filed in this court February 19, 1941, as that of a poor person without cash deposit or security for costs.

It appears from the record that after the jury had been sworn to try the case, counsel for the defendant asked leave to file a general demurrer to the information, for the reason that the information does not state facts sufficient to constitute a public offense. The court ruled: "You are too late, you waived it when you impaneled the jury."

At the close of the state's testimony the defendant interposed a demurrer to the same and moved the court for a directed verdict of acquittal. Both the demurrer and the motion were overruled and exceptions allowed.

The same questions were again raised in his motion for a new trial.

The errors assigned are substantially as follows: That the verdict of the jury was contrary to both the law and the evidence; that the court erred in its rulings in the admission of incompetent evidence, and in giving certain instructions duly excepted to; but no briefs have been filed and no appearance made when the case was called for oral argument and final submission on September 25, 1941; thereupon the case was submitted on the record.

This court has repeatedly laid down the rule that where no briefs are filed and no counsel appears the court will not diligently search the record to discover errors, but will look to the jurisdictioin of the court and the sufficiency of the evidence to support the conviction.

Dorothy Hamilton testified that she was 13 years of age on the 10th day of March, 1940; that she was well

acquainted with Herman Woodruff, and had known him for several years, that he had lived as a near neighbor, and that she would often see him on the street; that Mr. Woodruff sometimes gave her money, a nickel or a dime to buy candy or to go to the show; that she went twice to the room where Mr. Woodruff lived, near the Upchurch Hotel, in Anadarko; that school was out in Anadarko May 17, 1940, and she went to Herman Woodruff's room on that day.

She was then asked:

"Q. Now, Dorothy, just tell the jury what happened, what took place there in Herman Woodruff's room after you went up there on May 17th, this year? A. (No answer). Q. Was Mr. Woodruff in the room? A. Yes, sir. Q. Did you knock on the door? A. Yes, sir. Q. Did he ask you to come in? A. Yes, sir. Q. Did you just open the door and walk right in? A. It wasn't closed. Q. Was there a screen on his door? A. No, sir."

She was then asked about 20 leading and suggestive questions which she refused to answer.

"Q. You went up to Mr. Woodruff's room on Friday, May 17th. Now did you go back up there on the following Monday? A. Yes, sir. Q. Now, did anybody come in up there while you were there? A. Yes, sir. Q. Who was it? A. Grover King, a policeman. Q. Did Grover King take you to the county attorney's office? A. Yes, sir. Q. Did you tell the county attorney what had been taking place up in Herman Woodruff's room? A. Yes, sir. Q. You told him the truth about it, didn't you? A. (No answer). Q. Did you? A. (No answer). Q. Will you answer the question? A. No, sir. Q. Will you tell the court why you won't answer the question? A. No. Q. You answered the questions that were asked you at the preliminary hearing, didn't you? A. Yes, sir. Q. Did you answer those questions truthfully? A. I did, as good as I could. Q. You testified at the preliminary hearing as to just what took place up there in Herman Woodruff's room, didn't you, on May 17, 1940; isn't that right? A.

Yes, sir. Q. And your testimony at that time was just what actually happened on the 17th of May, 1940? Mr. Cooper: I object to that line of questioning. The Court: Overruled; on account of the witness being young, and rather reluctant, I will permit it? Mr. Cooper: Exception. Q. Now, Dorothy, at the time you were testifying here in the preliminary hearing, didn't you testify that you went up there to Mr. Woodruff's room, and that you and he had some talk there, a conversation, and that he asked you to do it? A. (No answer). Q. Now didn't you say that in the preliminary hearing? Mr. Cooper: I object to that. The Court: Overruled. Exception allowed. A. (No answer)."

The same question was again asked five times, with no answers:

"Q. Didn't you make the statement on the witness stand at the preliminary hearing? A. Yes, sir. Q. And that is the truth, is it? A. (No answer). Q. Herman Woodruff did that, did he? A. (No answer). Q. Just answer the question? A. (No answer) . Q. Now, after he asked you to do it, you testified in the preliminary hearing that you took off your underclothes and that he unbuttoned his pants, didn't you? A. (No answer). Q. Didn't you testify to that? A. (No answer). Objection as improper examination of the witness? The Court: Overruled: the record may show hesitation and long waiting on the part of the witness. Mr. Cooper: Exception. Q. Isn't that right, Dorothy? A. (No answer). Q. You testified to that, didn't you? A. (No answer).

The same question was repeated seven times, no answer each time.

"Q. Will you tell me, Dorothy, why you won't answer my questions? A. (No answer). Q. You answered my questions at the preliminary hearing, didn't you? A. Yes, sir. Q. And you testified at the preliminary that after Herman asked you to do it, you took off your under pants and that he unbuttoned his pants, didn't you. A. (No answer). Q. Didn't you so testify at the preliminary hearing? A. (No answer)."

294

Same objections overruled, exceptions allowed.

"Q. Didn't you so testify at the preliminary hearing? A. (No answer). Q. Did you? A. (No answer). The Court: I think she said 'yes', didn't she? Q. Did you say 'yes'? A. (Witness shakes her head 'no')."

The same question was repeated several times, no answers.

"Q. Have you talked with the defendant since the preliminary hearing? A. No, sir. Q. Are you trying to shield the defendant? A. No, sir. Q. Then why don't you answer my questions? A. (No answer). Q. What happened up there in Herman Woodruff's room on May 17th, 1940? A. (No answer)."

The same question was asked six or seven times, and no answer.

"Q. Did you testify at the preliminary hearing that Red Woodruff took you up on his lap astraddle of him and placed his male organ against yours? A. (No answer). Q. Did you testify on the preliminary hearing that he gave you a quarter after he quit trying to have intercourse with you? A. (No answer). Q. Will you answer my question, Dorothy? A. (No answer). Q. What did I tell you this morning, when I was talking to you out there in the hall? Will you tell the jury that? A. You told me to the answer the questions. Q. I told you to tell the truth then, didn't I? A. Yes, sir. Q. Why don't you do it? A. Because I told you once."

The former question repeated. No answer.

"Mr. Barney: If the court please, could we have a few minutes recess? A. The Court: Yes, sir, don't talk to her in the presence of the jury."

Thereupon the county attorney, his assistant, the prosecuting witness and her mother retired to the Judge's private chambers. During the recess Mr. Barney stated to the court: "She says she will testify if the audience is removed from the courtroom."

The court thereupon directed "that every one in the courtroom, who is not interested, leave the courtroom a few minutes until we see if she will answer the questions." The audience retired. The jury returned to the jury box and the following proceedings were had:

"Mr. Cooper: I want to make a record that the prosecutrix during the course of the direct examination was permitted to be taken, by her mother and counsel for the state, into a private room to be coached on the matter of her examination. The Court: Let the record show that the objection is overruled, for the reason that the child being a mere child, would sit on the witness stand for as much as five minutes at a time without answering any question, apparently embarrassed or frightened, and was permitted for the purpose of her mother or the county attorney talking with her to try to overcome the embarrassment. Mr. Cooper: To which ruling and remarks of the court the defendant excepts."

As taken from the transcript, her further testimony is as follows:

"Q. Dorothy, up there in Mr. Woodruff's room, in the Upchurch Hotel, on May 17th, did he ask you to take off your pants? A. Yes, sir. Q. Did you take them off? A. Not right then, I didn't. Q. Did you later, that same day, at that same time, take off your pants? A. Yes, sir. Q. Did Mr. Woodruff unbotton his pants? A. Yes, sir. Q. And did Mr. Woodruff have you sit on his lap? A. Yes, sir. Q. Now did Mr. Woodruff have you sit still on his lap? A. Yes, sir. Q. Was that after he had unbuttoned his pants? A. Yes, sir. Q. Was Mr. Woodruff sitting on the bed at that time? A. Yes, sir. Q. Did Mr. Woodruff take his male sex organ and place it against you? A. Yes, sir. Q. Did he place it against your female sex organ? A. Yes, sir. Q. And then did he pull you toward him? A. (No answer). Q. Did he take hold of you with his hands then? A. No, sir. Q. Did he put his arms around you? A. No, sir. Q. Did he put his hands on your hips? A. No, sir. Q. Did he press against you? A. No, sir. Q. How long did you sit astraddle of

Mr. Woodruff's lap?  A. I don't know.  Q. Did he have his male sex organ against your female organ all the time you were sitting in his lap?  A. (No answer).  Q. Now I believe you testified on preliminary hearing that he took hold of you and pulled you back and forth up against him didn't you?  A. No, sir.  Q. Well, did Mr. Woodruff, after you had taken off your panties and got up astraddle of Mr. Woodruff—what did he do?  A. I don't know what he done.  Q. Could you feel something being pressed against you?  A. No, sir.  Q. Did he take his male sex organ out of his pants?  Mr. Cooper: That is objected to for the reason that the same is a repetition. The Court: Yes, she was asked that question a while ago. Q. Did he move back and forth any?  A. I don't know. Q. What?  A. I don't know.  Q. Now, Dorothy, after you got off of Mr. Woodruff's lap, did he give you any money? A. Yes, sir.  Q. How much did he give you?  A. I do not remember how much he gave me.  Q. I will ask you if he gave you a quarter?  A. Yes, sir."

Objection that the question was leading.  Overruled. Exception.

"Q. Now after you got off of his lap, did you put your panties back on?  A. Yes, sir.  Q. And did he button up his pants?  A. Yes, sir.  Q. And then what did you do?  A. I left.  Q. Now when was the next time you went back to Mr. Woodruff's room?  A. Monday.  Q. Now was it the next Monday after that Friday?  A. Yes, sir.  Q. And on Monday, Mr. Woodruff asked you again if you wanted to do it, didn't he?  A. Yes, sir.  Q. What did you tell him?  A. I told him 'no.'  Q. Did he have you take off your pants that day?  A. No, sir.  Q. How long had you been there before Grover King came up? A. Just a few minutes.  Q. Had he ever tried to get you to do it before that Friday?  A. Yes, sir.  Q. How many times?  A. Once.  Q. And where was that?  A. At the same place.  Q. And when was that?  A. I don't know when it was.  Q. Now when Grover King took you to the county attorney's office, at first you would not tell what happened, would you?  A. No, sir.  Q. But you later told

them what happened? A. Yes, sir. Q. Now did Mr. Woodruff ever get his male sex organ inside of you? A. No, sir. Q. Did he have it up against your sex organ? A. Yes, sir. Q. He did get it up against your sex organ? A. Yes, sir. Q. And he was pressing on it? A. Yes, sir. Q. And he was moving back and forth? A. No, sir. Q. Just pressing against yours. Now did he tell you, when he asked you if you wanted to do it, did he tell you to take off your pants on Friday May 17th? A. No, sir. Q. And it was because he told you that you did take them off? A. No, sir. Q. Well, why did you take them off? A. Because he said he was going to give me some money. Q. And you took them off because he was going to give you some money for doing it? A. Yes, sir. Q. Now, Dorothy, you are not married, are you? A. No, sir. Q. You are not married to Herman Woodruff? A. No, sir."

On cross-examination she stated that Mr. Woodruff had given her money for two or three years, or it might be a little longer, and she guessed he gave her brothers, Jack and Gene, some money.

Her further cross-examination is as follows:

"Q. Now, then, when Grover King came in there, what did he say to you, Dorothy? A. He didn't say anything to me. Just then. Q. I will ask you, Dorothy, if he didn't say to you, there, that he was going to send you to the reform school? A. Yes, sir, that is how they got it out of me. Q. Grover King is the man that said that, is he? A. It was either him or George Nixon. Q. Was George Nixon down there too? A. No, but he took me to his office. Q. He told you if you didn't tell him, he was going to send you to the reform school, is that right? A. Yes, sir. Q. Now, you know what the reform school is, don't you? A. Yes, sir. Q. And you know it was kind of a prison for girls didn't you? A. Yes, sir. Q. And did that scare you? A. A little. Q. And you told them that simply because they threatened to send you to the reform school? A. Yes, sir. Q. Otherwise you would not have said anything about it? A. No, sir. Q. Was this

in the county attorney's office or down at George Nixon's office, where they told you they were going to send you to the reform school? A. At the county attorney's office. Q. And the county attorney is the one that told you that he was going to do that if you didn't tell it? A. I believe it was; I am not for sure. Q. Now, who all were there in the county attorney's office at the time this took place, Dorothy? A. Well, Mr. Barney, George Nixon, and Mr. Pugh were in there, Grover King wasn't in there all the time. Q. Dorothy, is that the reason why you told them that story? A. What? Q. Because you were afraid they would send you to the reform school? A. Yes, sir. Q. Now, what other questions in the county attorney's office did Mr. Pugh ask you? A. I don't remember what he said, he said a lots of things. Q. Well, do you remember some of the things? A. He said he was going to send me to the reform school, that is all I remember. Q. Now, you testified at the preliminary hearing, didn't you, Dorothy. A. Yes, sir. Q. And at that hearing I will ask you if you didn't testify in response to any question that Mr. Woodruff actually penetrated you, I mean, got his private parts up in your private parts; did you testify to that? A. Yes, sir. Q. Now, then, you testified, just a minute ago, in response to Mr. Barney's question, that he didn't get it in; didn't you; did you testify to that? A. Yes, sir. Q. Well, now, Dorothy, which one of those statements do you want the jury to believe? You see this is all for their benefit; it is not for mine. Do you want them to believe now when you testified on direct examination that he didn't get it in, that he just got it up against you, or do you want them to believe that he actually put it into you? Which one of those statements do you want the jury to believe? A. The one that he didn't. Q. Now in the preliminary hearing, how did you testify in response to my question that you sat on the foot of the bed and talked to Mr. Woodruff, on the 17th day of May, and that he was sitting up to the head of the bed. How about it. A. (No answer). Q. Now answer the question. We are just talking here, you and I, just talking. Just tell me whether you testified to that

or not? A. Yes, sir. Q. And did you tell me that during all the time you were there, that you sat at the foot of the bed and he sat up at the head of the bed. A. Yes, sir. Q. And that is actually what happened, isn't it, Dorothy? A. Yes, sir. Q. And on this 17th day of May— now you never did go over to where he was, did you? A. Yes, sir. Q. And that was on Friday, wasn't it? A. I guess so. Q. Well, how do you know it was on Friday, May 17th? A. I said I guessed it was; I don't know whether it was or not. That is what it came out in the paper that it was? Q. And you fixed it from that; is that the way you fixed it? A. Yes, sir. Q. Well, you say this was on Friday, the day school closed in the spring? A. I guess so."

The only other witness called by the state, Grover King, testified that he was a city policeman and about May 20, 1940, he went to Herman Woodruff's room, in the Upchurch Hotel; Dorothy Hamilton, fully dressed, was sitting on the bed. He took her to the city hall, and from there Mr. Nixon brought her to the county attorney's office.

On cross-examination he stated that when he went in he asked Dorothy what she was doing down there; she replied she came down to borrow some lard, then he asked Woodruff what he was doing with this little girl down there, and he said she came there to borrow lard.

The defendant in his own behalf stated that his age was 75 years, and he had lived in Anadarko since 1900, and lived in the second room from the north in the one-story concrete building, having four side-by-side rooms, located on Hotel Upchurch lots; that he had known Dorothy Hamilton, her mother, Mrs. Thelma Hamilton, and her brothers, Gene and Jack, right at ten years; that her husband had abandoned Mrs. Hamilton and their children and she worked for the past ten years in Beard's laundry. Friday, May 17, 1940, was community sales day in Ana-

darko; that morning he left his room about 7:30, and Raymond Jordan carried his grip for him to the First State Bank corner, where he sells pencils, razor blades, needles, aspirin and other things; that he was there until 9 o'clock that night, when Raymond Jordan carried his grip back to his room for him. That he was not back at his room that day. That occasionally the Hamilton children, Dorothy, Gene, and Jack, sold pencils and other articles for him; he produced a bible that he bought from Dorothy to give to his nephew's daughter, a little girl about Dorothy's age. That he never at any time talked to Dorothy Hamilton relative to intercourse. That he never attempted to have sexual intercourse with her at any time and denied having had improper relations of any kind at any time with her. He categorically denied all acts of improper conduct as suggested by the leading questions asked by the prosecuting attorney in his examination of the prosecuting witness.

That the day Grover King came into his room he said, "Dorothy, what are you doing here?" Dorothy said her mother had sent her to get some lard, and King said to him, "Red, what is Dorothy doing here?" He said, "Grover, just what she told you, she came to get some lard," and he had given her a quarter to go on and get it; she wanted him to give her another quarter. That he often helped Mrs. Hamilton out, because they needed things. Grover King told Dorothy to come with him, and told her this six or seven times; that he told Dorothy to go with Mr. King, that when they went out he heard Grover King tell Dorothy that she had to swear against him, that if she did not he was going to take her on over to Tecumseh.

He further testified that when 25 years of age, he was breaking horses and had an accident, which mashed his testicles and caused an inguinal hernia and he had

to wear a truss and a suspensory. He then offered to submit to an examination.

"The Court: Well, nobody has questioned it."

On cross-examination he stated that he never asked the prosecutrix to come to his place, and denied any misconduct on his part at any time.

Ed Wilmuth testified that he lived at the Upchurch Hotel when he worked on the railroad, but moved from there to the Hammert place several years ago, and visited the defendant there once or twice since; saw Dorothy carrying a grip in which he carried his pencils and trinkets, for the defendant.

The transcript of the testimony of the four witnesses who testified in the case covers nearly 100 pages, but the foregoing is a substantial statement of all the evidence in the case.

Upon an examination of the record and considering the proceedings on the trial, our conclusion is that the judgment in this case cannot be permitted to stand.

In the view we take of the record, we deem it unnecessary to discuss questions arising upon the rulings of the court on the trial, further than to observe that the flagrant impropriety of the questions asked on the examination of the prosecuting witness, and that its effects upon the jury would be prejudicial is self-evident. The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proven if true, is prejudicial. Cline v. State, 57 Okla. Cr. 206, 47 P. 2d 191.

The record shows that the only issue submitted to the jury was the question of attempt to commit the crime of rape in the first degree, and the court did not submit the issue of assault with intent to rape.

Under the statute the trial court should submit the case to the jury for consideration upon every included lesser offense which the evidence in any reasonable view of it suggests, and the instructions must be applicable to the testimony introduced upon the trial. Section 3097, Sts. 1931, 22 O. S. 1941 § 916.

The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury has been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, a judgment of conviction will be set aside. Miles v. State, 41 Okla. Cr. 283, 273 P. 284.

It clearly appears from the record that the case was tried and submitted to the jury upon an erroneous theory of the law, prejudicial to the substantial rights of the defendant. Williams v. State, 10 Okla. Cr. 336, 136 P. 599.

The principal assignment of error is that the evidence is insufficient to sustain the verdict or support the judgment of conviction.

The conviction rests solely upon the uncorroborated testimony of the prosecutrix.

The rule must be taken as settled in this state that while a conviction for statutory rape may be had on the uncorroborated testimony of the prosecutrix, this is only warranted when all the other facts and circumstances of the offense are corroborative of her testimony and her statements are not inconsistent or contradictory. Without such surrounding facts and circumstances, the bald statement of the prosecutrix against the defendant would be so devoid of testimonial value as to render it unworthy of belief. Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; David-

son v. State, 57 Okla. Cr. 188, 46 P. 2d 573; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Allen v. State, 10 Okla. Cr. 55, 134 P. 91.

It will be seen from the statement of the testimony that the evidence adduced to establish the corpus delicti is of a very doubtful and inconclusive character; it consists exclusively of the monosyllable answers by the prosecutrix to leading and suggestive questions propounded by the prosecuting attorney, and on her cross-examination she unhesitatingly states that her testimony was obtained through fear and threats by officers in the courthouse, in that they told her that unless she would so testify they would send her to the reform school at Tecumseh. It also appears that there is a direct conflict in her testimony.

In prosecution for statutory rape, the credibility of the prosecutrix may be impeached by proof that she made statements relative to the issue contrary to what she has testified to on the trial, and where the testimony of the prosecutrix is self-contradictory and was obtained through fear, threats or coercion, and where such testimony is not corroborated by other material testimony as to the commission of the offense, a conviction of attempt to commit rape will not be sustained. McDonald v. State, 61 Okla. Cr. 287, 67 P. 2d 806.

The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty. Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838. A fair trial is guaranteed to all

persons whether innocent or guilty, and it is the duty of the trial court to uphold this guaranty.

Our conclusion is that the evidence was insufficient to justify or sustain the verdict, and that the verdict was more the result of prejudice than the calm and dispassionate conclusion of the jury upon the facts in evidence.

For the reasons stated and because the evidence is entirely insufficient to support the conviction, the judgment of conviction should be reversed and the cause remanded to the district court of Caddo county, with direction to dismiss. It is so ordered.

BAREFOOT, P. J., and JONES, J., concur.