# DONALD EUGENE FIELDS v. STATE.

No. A-10279.   May 19, 1943.

(138 P. 2d 124.)

2

Sid White, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

PER CURIAM. This appeal is from a judgment rendered on the verdict of a jury finding "the defendant, Donald Eugene Fields, guilty of the crime of grand larceny, as charged in the information, and leaving his punishment to be fixed by the court."

The information, omitting formal parts, charged that on the 21 day of July, 1941, in Oklahoma county, the said defendant "then and there being, did then and there wilfully, unlawfully and feloniously commit the crime of

Larceny from the Person

in the manner and form as follows, to wit: That is to say the said defendant while acting conjointly and together with Floyd Martin and Earl J. Johnson, Jr., both of whom are juveniles, in the county and state aforesaid, and on the day and year aforesaid, then and there did then and there wilfully, unlawfully and feloniously take, steal and carry away from the person and immediate possession of Mrs. L. M. Richardson, a dark brown imitation leather woman's purse, with zipper and handles, containing miscellaneous articles such as eye-glass case, house keys, an Eversharp pencil and 30¢ good and lawful money of the United States of America, and all of the total value of $2.50 good and lawful money of the United States of America, the said taking, stealing and carrying away of said money and articles on the part of the said defendant was by stealth and fraud and without the knowledge and consent of the owner, and with the felonious intent to appropriate the same to his own use and benefit and to permanently deprive the said rightful owner thereof," contrary to etc.

4

Motion for new trial was duly filed and overruled; thereupon the court sentenced the defendant, Donald Eugene Fields, to imprisonment in the State Reformatory at Granite for the term of nine months.

The record shows following application to suspend sentence:

"That because of the age of defendant and because of the circumstances of this case, as the same are well and fully known to the court, the sentence heretofore imposed herein should be suspended in the exercise of sound discretion.

"Wherefore, the defendant prays that this sentence be suspended conformable to the laws of the State of Oklahoma."

Which being presented, the court entered the following order:

"The foregoing application being presented to the court and it appearing right and proper so to do, the court, at this time, refuses to suspend sentence imposed herein but reserves jurisdiction so to do if that course later appears advisable."

The record further shows that upon the defendant's application the court on January 16, 1942, entered an order directing:

"That the court reporter be and he is hereby directed to prepare and furnish the defendant a case-made herein for his said appeal, and that the county pay therefor."

The petition in error with case-made was filed in this court May 25, 1942.

The grounds of the motion for new trial and assigned as error in the petition are substantially as follows:

That the verdict of the jury was contrary to both the law and the evidence; that the court erred in admitting

incompetent, irrelevant and immaterial evidence over the objections of the defendant; that the court erred in refusing to give instructions requested by the defendant; that the court erred in giving instructions duly excepted to; "and that the errors herein complained of are prejudicial to the rights of the defendant, and all of them prevented him from having a fair and impartial trial", but no briefs have been filed and no appearance made when the case was called for final submission on March 24, 1943; thereupon the case was submitted on the record.

This court has repeatedly laid down the rule that where no briefs are filed, and no counsel appears the court will not diligently search the record to discover errors, but will look to the jurisdiction of the court as shown by the record proper and the sufficiency of the evidence to support the conviction. Dillard v. State, 68 Okla. Cr. 432, 99 P. 2d 530.

The testimony in the case was substantially as follows:

Mrs. L. M. Richardson testified:

"I live 100 S.E. 38 St., Oklahoma City; on July 21, 1941, I was waiting on the south east corner of 12th and Pennsylvania streets for a street car, between 10 and 10:30 that evening. A large filling station on the corner was lighted up, a coupe going east stopped at the stop line, three boys were in the car, the boy on the driver's seat next to me got out of the car, I just thought the other two boys had brought him there to wait for the street car, and they were talking, I noticed though they hesitated a little longer than was necessary for just stopping at a stop line, their car rolled down towards where the street car turned south, and they backed the car even up with me, they did that two or three times, and I thought they were waiting for the street car there, so I just stood there, and in a few minutes they took my purse."

She further testified as follows:

"Q. When you say 'they' what do you mean? A. Well, of course, I just assumed it was the one that was out of the car, because I had my back turned at the time that he grabbed my purse. Q. He was a boy, was he? A. I would say they were all three young boys. Q. Would you observe this young man sitting here? A. This boy was about the size of this boy. One thing I noticed particularly was that his hair was sort of tousled, not slicked down like a lot of boys are. Q. Was your purse taken? A. Yes, sir. Q. What was in your purse? A. Well, not anything of any value to anyone but me. There was 30 cents in cash, my glass case, and some little individual effects, that people carry, and my house keys, and there were handkerchiefs. Q. You did not give it to whoever took it or give him any permission to take it? A. No, sir. It was just jerked out of my hand. Q. What happened after the bag was jerked out of your hand? A. The car turned the corner and went down the street. Q. Did you notify the police? A. I just called to the fellows at the filling station, but they didn't understand what I was saying. A short time after that a scout car pulled up, to the stop line, and I told him, and gave him the best description I could of the car and the boys. Q. The things about which you testify happened in Oklahoma county, Oklahoma? A. Yes. By Mr. White: We move to exclude the testimony of the witness as not pertaining to the charge as alleged in the information. By the Court: Overruled. Exception."

"Cross-examination:

"Q. And you don't know whether this boy was among them or not for certain? A. Well, I just know that the boy that was out of the car was a boy the size of this boy. Q. Just answer me, please. You don't know whether or not this boy was among the crowd of boys? A. I couldn't say that positively."

Wayne Harbolt, police officer, testified:

"I am attached to the division of robberies, Vincent Moncrief was my working partner at the time, I did some work on this case."

Handed a paper marked "State's Exhibit 1" for identification, stated:

"That is my name, W. W. Harbolt, down in the corner, as a witness. Across in the lower right hand corner, the name 'Eugene Fields' was written in my presence; this defendant here signed that paper in my presence, I dictated the statement, it is true and correct information which this defendant gave to me at that time, it is condensed, we just kinda condensed it and he read it and signed it, he didn't suggest any amendments or changes, I didn't offer him anything to get him to sign that statement, did not threaten him and tell him anything that would happen to him if he didn't sign it. That is a voluntary statement of his."

Thereupon "Exhibit No. 1" was offered in evidence.

The record here is as follows:

"(The following proceedings held out of the presence of the jury): By Mr. White: Mr. Harbolt, where was the defendant at the time the statement was taken? A. He was in one of these little antirooms there. Q. Was the defendant being held in the city jail? A. That was before he was put in the city jail, it was shortly after he was arrested. Q. How long would you say after his arrest? A. Oh, that has been so long ago, but off hand I would say within 30 or 40 minutes. Q. Had he had an opportunity to confer with his father or mother? A. No, sir; he did not. Q. Had he asked for an opportunity? A. No, he did not ask me. Q. Had he had an opportunity to confer with an attorney? A. No, sir. Q. Had he requested that? A. Sir? Q. Had he asked that? A. No, he had not said anything about an attorney. Q. How did he happen to make this statement? A. That night—I will have to get their names. We arrested Floyd Martin and Earl J. Johnson, who were juveniles, and they had told

us about these, and then Moncrief and myself asked Ed White and Ewing if they were out there and saw this boy to pick him up and bring him in for us, and they did. Q. His statements were made in response to questions by you? A. Yes, sir. Q. He did not come in voluntarily and tell you what you put in there; all the statements he made were while you were holding him in custody? A. Yes, sir. Q. And in response to questions put to him? A. I will state we talked to him and he told us all of this, and we asked him to make a statement and he did. Q. The information was elicited by asking him questions on the part of the Police Department and officials, that is the way you got the information in the first place from him? A. Yes, he told us about it, and then we kind of outlined what all he had done. Q. You did that? A. That is right, he told us. Mr. White: We object to this as no voluntary statement of the witness. The Court: Overruled. Exception. Q. (By Mr. White) So as to make the record clear, before the instrument marked State's Exhibit No. 1 was prepared or signed, the defendant had been placed under arrest and brought to the police station? A. Yes, sir. Q. And was then in custody? A. Yes, sir. Mr. White: That is all. The Court: All right; let us go back to the court room. Q. (By Mr. Marlin) Now calling your attention to a name written in the lower right-hand corner of Exhibit 1, do you recognize that? A. Yes, sir; that is 'Eugene Fields'. Q. Who wrote that signature on there? A. This boy right over there, Eugene Fields. Q. This defendant? A. Yes, sir. Q. Now, referring to that part of the statement which is enclosed in brackets, is that the information this boy gave you? A. Yes, sir. Q. That is, at the time you talked to him? A. Yes, sir. Q. Just how was that statement prepared? A. Well, after talking to him and getting his story, we condensed what he had told us and put it in this statement here. That is just generally the mere facts, which we always do in taking statements. Q. State whether or not this defendant read that statement after it was written? A. Yes, sir; he did. Q. And he signed it. A.

Yes, sir. Q. Mr. Marlin: We offer in evidence State's Exhibit No. 1. Mr. White: We renew the objection based on the testimony given. The Court: Overruled. Mr. White. Exception."

State's Exhibit No. 1, admitted in evidence, is as follows:

### "Statement

"The following is a statement of Donald Eugene Fields (Wm) age 17, of 2832 NW 15th, relative to purse snatchings in Oklahoma City.

"I, Donald Eugene Fields, make this statement of my own free will and accord in the presence of witnesses in the detective bureau of the Oklahoma City Police Department, without threat or promise being made to me on the part of anyone concerned, knowing also that whatever I may say herein may be used against me in case criminal charges are filed.

"On Monday, July 21, 1941 Sonny Johnson and I were at Reed Park, when Floyd Martin came by in a maroon colored Oldsmobile coupe and asked us to go riding with him. He said he got this car from a used car lot, where he told them he wanted to try it out before buying it. He had done this several times before. Sonny and I went with him in this car to Lincoln Park, where we spent some time, then came back to town, where we ran out of gas at about N.W. 3rd and Lee. We left the car there, and Sonny and I waited around there while Martin went after another car. Pretty soon he came back in a grey Oldsmobile coupe, and we got in with him. We decided we needed some money, so Floyd suggested snatching some purses.

"We drove around the northwest part of town, and saw a woman walking down the sidewalk at about 13th and N. Harvey. I got out and ran up behind her and grabbed her purse, but she held on to it and cussed me out, and I ran back to the car without the purse.

"Later that evening we were driving east on N.W. 12th in the 2100 block, when we saw a woman standing at 12th and Pennsylvania waiting for a street car, on the southwest corner. I got out and stood on the running board on the driver's side of the car, and Floyd was driving. When we reached the stop line where the woman was, I got off the car and grabbed her purse, getting back on the running board and we went south on Pennsylvania. We got 30¢ in change from this purse, (a dime and four nickels) and a pen and pencil set which Floyd kept. We later threw the purse away. We went to the Ranch House at 10th and N. May and got three cokes and bought a gallon of gas with the 30¢ we got from this purse.

"That same evening while around 15th and N. Virginia, Floyd tried to get a woman's purse but I don't believe he got it. I was driving the car at that time. I believe we tried to get another woman's purse, but I do not remember where it was. We also drove around in the vicinity of the 2200 block N. W. 26th looking for a boy, and saw a house with the lights on but did not see any people.

"After finding no one at home, we (Buddy Martin and I) left Sonny in the car and Martin held the front door open while I went into the living room, where I found a package of Raleigh cigarettes with about four cigarettes in it, lying on a small table near the door, which I took. We then left, and while in the same vicinity, saw a house where some people were having a party. We saw some purses laying on a divan in one of the rooms, and tried to get in, but the door was locked, and we left.

"I hereby certify that I have made and read the foregoing statement and find it to be true and correct to the best of my knowledge so help me God.

"Signed: Eugene Field
"Donald Eugene Fields
"Witnesses:
"(Signed) C. E. Moncrief
"W. W. Harbolt."

"Q. (By Mr. Marlin) C. E. Moncrief, I believe you stated, was your working partner at that time? A. Yes, sir. Q. And the things which you have testified about happened in Oklahoma County, State of Oklahoma? A. Yes, sir; they did. Mr. White: Your Honor, it is rather difficult to properly save the record. Will your Honor make the record show our objection to each separate portion of this thing. The Court: Yes, let the record so show. Mr. White: More particularly insofar as it refers to any transaction except the identical difficulty herein involved. and in its entirety, because of the testimony taken. The Court: Overruled. Exception.

Cross - Examination.

"Q. This statement was taken at the police station? A. Yes, sir. Q. In response to questions asked by you or some member of the police force, and answers made by the defendant? A. After we had questioned him, yes, sir. Q. After you had questioned him and he had answered, then you dictated the paper? A. Yes, sir."

This was all the evidence in the case on the part of the state.

H.D. Fields, on behalf of the defendant, testified as follows:

"My name is H.D. Fields, I am with the Oklahoma City Fire Department, have been on the Fire Department a little over 19 years; will be ready to be retired next June, I am the father of the defendant; his age was 17 years last March 24th. The Court: Let the record show that both sides rest. Mr. White: The defendant now moves the court to instruct the jury to find the defendant not guilty because the state has failed to prove the charges alleged in the information. The Court: Overruled. Exception. Mr. White: The defendant requests that the court instruct the jury they must fix the punishment if they find the defendant guilty. By the Court: Overruled. Exception."

An examination and consideration of the record in this case leads to the conclusion that the judgment of conviction should be reversed, and this without regard to the merits of the question of the guilt or innocence of the defendant. As we view the record, to affirm the judgment would do violence to well settled rules of practice and procedure in criminal prosecutions.

Of the errors assigned, we shall notice those only which on the new trial granted will be liable to again arise.

The errors assigned upon exceptions taken to rulings of the court in the admission of "Exhibit No. 1", a written statement, purporting to be a confession,signed by the defendant,we think were well founded.

It must be admitted that the case against the defendant dependent upon the testimony of the prosecuting witness in itself is wholly insufficient to sustain a conviction.

A confession, in a legal sense, is restricted to an acknowledgment of guilt, made by a person after an offense has been committed, and does not apply to statements or declarations of independent facts from which such guilt may be inferred.

In Mays v. State,19 Okla. Cr. 102, 197 P. 1064, 1070, we said:

"Extrajudicial confessions are those which are made by the defendant out of court, whether to an official or nonofficial person. It is elementary law that such confessions, in order to be admissible, must be entirely free and voluntary. The rule is well established that confessions induced by a promise of benefit or a threat of harm, made to the defendant by a prosecuting attorney or an officer having him in custody, or by any one having authority over him, or made by a private person in the

presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence. Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383. ***In this state it is a settled rule of practice that the admissibility of a confession where objection is interposed is primarily a question for the court, and should be determined preliminary to allowing the confession to go to the jury, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. Berry v. State, 4 Okla. Cr. 202, 111 P. 676, 31 L.R.A., N.S. 849; Wilson v. State, 17 Okla. Cr. 47, 183 P. 613.

"After a confession has been admitted, the defendant is entitled to have the evidence in regard to the manner in which it was obtained given anew to the jury, not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence; and the jury may disregard it if they are not satisfied that it is voluntary." And see Howington v. State, 35 Okla. Cr. 352, 250 P. 941.

It appears from the record that after the statement was admitted, the evidence in regard to the manner in which it was obtained, given in the absence of the jury, was not given anew to the jury, and it appears that the instructions given by the court do not refer to the law of confessions or admissions against interest on the part of the defendant.

The general rule is that, when a defendant is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone. Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383; Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273.

In Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann. Cas. 1916A, 689, this court held:

"Evidence of an offense other than the one charged is admissible only when it tends to prove the offense charged. To be competent and admissible, it must have some logical connection with the offense charged." And see Pressley v. State, 71 Okla. Cr. 436, 112 P.2d 809.

This rule is very tersely stated by Mr. Bishop in his New Criminal Procedure. He says:

"The state cannot prove against the defendant any crime not alleged either as a foundation for a separate punishment, or as aiding the proof that he is guilty of the one charged, even though he has put his character in issue."

And he says:

"Even where offenses are of a like sort, evidence to one is not ordinarily admissible in proof of another; as, on a trial for larceny, to show that the defendant has committed other and disconnected larcenies." 2 Bishop New Criminal Procedure (2d Ed.) §§ 1120 and 1124.

In 20 Am. Jur., Evidence, § 489, the rule stated is:

"In proving a confession, the prosecution may introduce parts of the conversation which show, or indicate, that the accused has committed other and separate offenses, where such admissions are inseparably connected with the confession of the crime charged. In such cases the whole confession is admissible in evidence and may go to the jury under directions that they shall disregard the parts of the confession which do not relate to the crime in issue. But when the parts of a conversation connected with a confession of the crime charged can be separated from those relating to other offenses, only those parts which are material to the crime charged should be received in evidence." See A.L.R., Annotation, pp. 1017, 1023.

20 Am. Juris., Evidence, § 316, reads:

"In a prosecution for one crime proof of another direct substantive crime is never admissible unless there is some legal connection between the two, upon which it can be said

that one tends to establish the other or some essential fact in issue. The courts stress the importance of this requisition due to the nature and prejudicial character of such evidence. The question of relevancy is obviously one to be decided in the light of the facts and circumstances in the particular case."

In People v. Canfield, 173 Cal. 309, 159 P.1046, the Supreme Court of California held: In a prosecution for grand larceny, the testimony of a witness as to another larceny, which defendant had committed on witness within a short time of the robbery charged, and at a place only five or six blocks away, was incompetent for the purpose of corroboration and of showing intent.        ,

A minor cannot sue or defend a suit in a civil action, and a defendant 17 years of age, charged with a felony, in the absence of parent, guardian or counsel, is incapable of waiving the constitutional and statutory safeguards provided by law in a criminal action, unless it appears beyond all doubt that the minor defendant fully understands the effect and the results growing out of such waiver.

The fact that the defendant, 17 years of age, under arrest on a felony charge, in the absence of parent, guardian or counsel, was not advised of his constitutional right to refuse to answer questions that might incriminate him, should be considered as affecting the admissibilty of any statements made by him purporting to be confession of guilt.

"Waiver" is either the result of an intentional relinquishment of a known right or an estoppel from enforcing it. It is largely a matter of intention. It must be based upon a full knowledge of the facts.

Waiver is defined as the voluntary relinquishment of a known right, and is a doctrine of very broad and

16

general application. It concedes a right, but assumes a voluntary and understanding relinquishment of it. It is a voluntary act, and implies an election to dispense with something of value, or to forego some advantage which a person might at his option have demanded and insisted on. State ex rel. Lea v. Brown, 166 Tenn. 699, 64 S.W.2d 841, 91 A.L.R. 1246.

Generally, the doctrine of "waiver" is applicable to all personal rights conferred by statute, and guaranteed by Constitution, provided that waiver does not violate public policy.

It appears in this connection from the record that the court failed to instruct the jury on the law applicable to the admission of evidence of other crimes other than that charged in the information.

Upon the record before us, and for the reasons stated, we are clearly of the opinion that the admission of State's Exhibit No. 1, purporting to be a confession on the part of the defendant, was prejudicial to the substantial rights of the defendant.

The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury has been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside. Woodruff v. State, 74 Okla. Cr. 289, 125 P.2d 211; Miles v. State, 41 Okla. Cr. 283, 273 P. 284.

Upon the record before us, it clearly appears that the case was tried and submitted to the jury upon the erroneous theory of the law, prejudicial to the substantial rights of the defendant.

For the reasons hereinbefore stated, the judgment of the district court of Oklahoma county is reversed, and the cause remanded to that court for further proceedings not inconsistent with the views expressed in this opinion.