## ALBERT MICHELIN v. STATE.

No. A-9500. May 26, 1939.

(90 P. 2d 1081.)

Geo. T. Arnett, of Idabel, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty., and Howard Phillips, Co. Atty., and Tom Finney, Sp. Pros., both of Idabel, for the State.

BAREFOOT, J. Defendant was charged with the larceny of domestic animals in McCurtain county; was tried, convicted, and sentenced to serve two years in the penitentiary, and has appealed.

The defendant was charged with the larceny of one hog (Hampshire) on April 30, 1937, the personal property of Bobo Smith, in McCurtain county.

It is contended, first, that the court erred in refusing to sustain the demurrer of defendant to the evidence, and failing to give an instruction directing a verdict of not guilty; and, second, that the court erred in admitting incompetent and improper evidence over the objection of defendant. Both of these errors may be considered together.

It is revealed by the record that defendant was charged in two cases in the district court of McCurtain county. The cases being Nos. 2779 and 2780. In case No. 2779 defendant was charged with the larceny of one hog on April 30, 1937, the personal property of Bobo Smith, and in case No. 2780 with the larceny of two hogs, on April 30, 1937, the personal property of Bobo Smith. The same proceedings were had in both of the above cases in reference to the filing of motions and demurrers, and on the 20th day of October, 1937, the defendant was placed on trial in case No. 2779. The evidence in this case revolves around a hog which defendant had sold to Milton Whitten, and by him to Clarence Lane, and which the state contended was the property of Bobo Smith. In the trial of this case, the court permitted the state to introduce evidence concerning the larceny of the two hogs which involves the charge in case No. 2780. It is the contention of defendant that this constitutes proof of two separate and distinct charges or crimes, and that under the general rule, evidence of another offense, though of the same nature, is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged.

There is no doubt of the correctness of the general rule as above announced. It is based upon the sound reason that no person shall be convicted of an offense by proving that he is guilty of another. This rule has been adhered to by this court from its earliest decisions to the present time, and is the general rule announced by all authorities. State v. Rule, 11 Okla. Cr. 237, 144 P. 807; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L. R. A. 1917D, 383; Middleton v. State, 16 Okla. Cr. 320, 183 P. 626; Herndon v. State, 16 Okla. Cr. 586, 185 P. 701; Graham v. State, 28 Okla. Cr. 266, 230 P. 763; People v. Molineux, 36 Misc. 435, 73 N. Y. S. 806; Id., 168 N. Y. 264, 291, 61 N. E. 286, 293, 62 L. R. A. 193; Underhill on Criminal Evidence, Sec. 88; People v. Sharp, 107 N. Y. 427, 471, 14 N. E. 319, 1 Am. St. Rep. 851; 2 Bishops New Crim. Proc., Sec. 1120; 16 C. J., Sec. 1132, p. 586. But at the same time this court has recognized that there are well established exceptions to this general rule, which exceptions are as well embedded in the law as the rule itself. An exhaustive discussion of this principle, with the exceptions to the general rule, were not only discussed by Judge Doyle in the case of State v. Rule, supra, but the general authorities were there cited, which give the reason for the exception. It is there shown that the general rule does not apply where the evidence of the other crime tends directly to prove defendant's guilt of the crime charged. Evidence which is relevant to defendant's guilt is not inadmissible because it proves or tends to prove him guilty of another and distinct crime. It is often the case that they are so inseparable that the proof of one necessarily involves proving the other. Another recognized exception is that where the proof of another crime is a part of the res gestae. Often the commission of other crimes are permitted to prove the criminal intent. Further exception to the general rule is where it is shown that the crime is a part of a plan or system of criminal action. This more often applies in cases of embezzlement or swindling, or crimes of this character. The

court in the body of the opinion, says [11 Okla. Cr. 237, 144 P. 811]:

"We are of opinion that evidence of other similar transactions under the same contract, whether before or afterwards, was relevant to the issue, and was not made inadmissible by reason of the fact that it would tend to prove the defendant guilty of another offense than that charged in the information. It was clearly admissible for the purpose of proving guilty knowledge, or the intent with which the act charged was committed. They were acts of the defendant in a continuous series of transactions with the same party under the same contract, and were precisely of the same character as the act for which he was being tried, and they were so connected that they formed a part of the res gestae, and were a part of the entire transaction under the defendant's contract to do the legislative printing for the House of Representatives. It may be regarded as settled that, where the offense charged is so connected with the other offenses sought to be proved as to form a part of an entire transaction, evidence of the latter may be given to show the character of the former. We think the evidence offered was clearly admissible under the first three of the exceptions stated above. It seems to us that the evidence offered was also admissible under the fourth exception stated above, for the purpose of proving a pre-existing design, or systematic scheme or plan, on the part of the defendant to cheat and defraud the state, which included the doing of the particular act charged.

"In the case of Koontz v. State, 10 Okla. Cr. 553, 139 P. 842 [Ann. Cas. 1916A, 689], this court said:

"'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish a common scheme or plan, embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the crime charged.'"

These exceptions to the general rule have been upheld in many cases involving not only embezzlement, swindling, and cases of a kindred nature, but also larceny,

robbery, burglary, and other similar crimes. Sledge v. State, 40 Okla. Cr. 421, 269 P. 385; Jackson v. State, 42 Okla. Cr. 86, 274 P. 696; Oldham v. State, 42 Okla. Cr. 209, 275 P. 383; Oldham v. State, 43 Okla. Cr. 314, 278 P. 663; Cole v. State, 50 Okla. Cr. 399, 298 P. 892; Reniff v. State, 53 Okla. Cr. 448, 13 P. 2d 592; Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591; Thacker v. State, 55 Okla. Cr. 161, 26 P. 2d 770; Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273; Mason v. State, 60 Okla. Cr. 427, 65 P. 2d 203; 16 C. J., sec. 1133 et seq.

We realize that this question is of serious import in the trial of criminal cases in this state. Every person charged with the commission of a crime is presumed to be innocent until his guilt has been established beyond a reasonable doubt; that he shall be charged with but one offense, and that he shall not be convicted for the commission of an offense other than the one charged. The court should, therefore, be very careful in drawing the line as to the introduction of this testimony, and in seeing that it comes clearly within the exception to the general rule before it is permitted to be introduced. We realize that in the proof of the charge, in order to ascertain the intent, the motive, or the identity of the person charged, it often develops in the trial of the case that other crimes have been committed by defendant, and often a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other. For the above reason, the courts have universally recognized the above well-defined exceptions to the general rule that the state cannot prove against a defendant any crime not alleged, either as a foundation for a seperate punishment or as aiding the proofs that he is guilty of the one charged. The cases from this court, including those cited in defendant's brief, Satterfield v. State, 32 Okla. Cr. 98, 240 P. 151; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L. R. A. 1917D, 383; Wyrick v. State, 37 Okla. Cr. 115, 255 P. 163; Ruffin v. State, 38 Okla. Cr.

343, 261 P. 378; Pearson v. State, 44 Okla. Cr. 19, 279 P. 700; Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273, are based upon facts where the state was permitted to introduce evidence of other definite specific crimes which were not directly connected with the charge alleged in the information or indictment, and not a part of the res gestae. These cases recognize the exception to the general rule as above stated.

Applying the rules of law above announced to the facts in the instant case, we find that defendant and the prosecuting witness, Bobo Smith, were engaged in the business of farming and stock raising in McCurtain county. Their hogs used the same open range. In the early spring of 1937, the latter part of March or the first of April, a witness, Charlie Lalley, who worked and rode the range for Dr. Tracey, recognized certain hogs in the pens of defendant as being the hogs of the prosecuting witness. He noticed that the marks had been recently changed. He reported this fact to Smith, who in a short while made an investigation, together with other parties who lived near the home of defendant. By this investigation certain hogs belonging to the prosecuting witness, Bobo Smith and Pierce Woods, some three of each of said parties, were found on defendant's premises. The markings of these hogs showed to have been changed in the right ear of each. The defendant was not at home when the investigation was made, and it was decided by the parties that the hogs should be placed in a truck and hauled up by defendant's place by Clarence Lane, and that Lane should tell defendant he had bought the hogs from a man by the name of Tate, who lived near the premises, and see if defendant would claim the hogs. This was done, but defendant was not at home at the time, but the two men who were working for him, Frank Clayburn and Felix Futrell, examined the hogs and stated they were the hogs of defendant. The hog with which defendant is charged with stealing in this case was not on the truck, but was at the home of Clarence

Lane, as this particular hog had been theretofore sold by defendant to a man by the name of Wilson Whitten, and by him traded to Clarence Lane. The possession of this hog was admitted by defendant, and he testified he owned it as will be hereafter shown, and that he had it penned for the reason that it was "breechy", and had gotten into his field several times and for this reason he disposed of it.

The defendant, when he returned home, went to the home of Pierce Woods and Clarence Lane, where the hogs had been taken. He identified the hogs as his own, and claimed they were a part of the hogs he had purchased from Ira Alexander, his brother-in-law. This conversation was had in the presence of Clarence Lane and Rushman Roden, who both testified at the trial to this conversation.

Many witnesses were offered by the state to show the mark of the prosecuting witness, which was "split and under bit the right, and crop and half under crop the left." That they examined the hogs found at defendant's home, and that the mark had been changed on the right ear and that there had been no change on the left ear. Several witnesses further identified a part of the hogs by flesh marks and other peculiarities of mark. They were positive in their identification. Several other hogs afterwards found at defendant's home and upon which the marks had been changed were identified as the hogs of the prosecuting witness, Bobo Smith. The hog which is involved in the case on trial was especially identified by several witnesses as the property of the prosecuting witness. Its right ear had been practically all cut away close to its head. Many of the witnesses for the state had known the mark of the prosecuting witness, Bobo Smith, for over a period of ten years, and testified to the peculiarity of his marking, and their being able to identify his mark.

Four of the hogs had been brought to Idabel, including the "Whitten hog," and were examined by the jury at the time of the trial. It was also shown that several wit-

nesses for the state had contributed to a fund to employ a special prosecutor in this case. The prosecuting witness testified that he had not seen his hogs since October or November, 1936, and that they were on the "range." He testified they were "listed" hogs, and by this is meant "one that is black with a white stripe across the shoulder and back."

Defendant, in his own behalf, testified that he was 49 years of age, and had lived for seven years eight miles north of Broken Bow, and that he was employed as super-intendent of Beaver Bend Park, by the Department of the Interior. That he was also engaged in the farming and ranching business, and engaged in buying and selling hogs to a limited extent. That sometime during October or November, 1936, late in the evening, a man by the name of "Walker," and whose given name he did not know, came to his home in a Ford truck. The turtle-back had been taken out and a large crate was on it, which contained nine hogs. That he finally purchased all of the hogs from the stranger "Walker" for $20. That he attempted to pay him by check, but that "Walker" asked him to pay him in cash, and said, "No, I am going north, if you have the money I will appreciate it." That he did not have the money, but secured the same from his wife and paid him in cash. That he had not seen or heard tell of "Walker" since that date, although he had made efforts to locate him in order to have him as a witness, but he had been in-formed that he had gone to Arizona. At his request his employees, Frank Clayburn and Felix Futrell, took posses-sion and unloaded the hogs, and he instructed them to mark them as near as they could in his mark which was "crop the right and under half crop the left." The de-fendant further testified that the hogs which he identified, and the ones claimed by the prosecuting witness, Bobo Smith, were the hogs which he purchased from the stranger "Walker." The defendant was corroborated in the above statement by his wife, Frank Clayburn and Felix Futrell,

his employees, and by Buster Lynn, his nephew, who testified to being present when the hogs were sold to defendant.

With reference to the "Whitten hog," he admitted selling it to "Whitten" and as a reason stated that it had been getting in his field and that the boys had "dogged" it and one of its ears was nearly torn off. That he told the boys not to do that, but to pen it, which they did, and for this reason he sold it. He claimed it was one of the identical hogs he had purchased from "Walker." He further testified that when he bought the hogs from "Walker" he inquired of "Walker" where he got the hogs, and he replied:

"A. Yes, I did. A. He told me he bought them in the bottom. A. He told me he bought them from a man by the name of Simpson."

The witness Cal Simpson testified for defendant. He said he lived south of Idabel. That he had sold six hogs to a man by the name of "Walker." That he had traded him the six hogs for a case of whisky. "That they were mixed up pigs. Some spotted and some darker."

"Q. Were any of those hogs Hampshire, had Hampshire marks? A. Yes, sir, some were. They were little— looked Hampshire and Poland China mixed, a mixed breed of pigs."

He testified he bought the pigs from a negro woman who lived in the Red river bottom, whose name he did not know. He kept them about a week before he sold them. That the man "Walker" had three other pigs in his truck at the time he bought the hogs from him. The witness was asked, on cross-examination:

"Q. If you did not tell Mat Brantley that the hogs involved in this case, that you bought from Mike Plant's wife, and traded the hogs to Felix Futrell for whisky? A. No, sir, I didn't. Q. Did you tell him anything like it? A. We were talking about hogs me and another boy bought before. I didn't tell him what I done with them nor what I paid. Q. I will ask you if Mr. Mat Brantley didn't tell

you, Now that won't do for I bought Mike Plant's hogs myself? A. No, sir. I bought Mitchell Plant's hogs, didn't have any to do with Mike. Q. Well, Mitchell Plant's? A. Yes, sir."

Mat Brantley, on cross-examination, testified:

"Q. What relation if any are you to Cal Simpson? A. We are brothers-in-law. Q. Back about the time of the preliminary hearing in this case, did you have a conversation with Cal Simpson in which Cal Simpson told you that he bought the hogs involved in this case from Mitchell Plant's wife? A. Yes, sir. Q. And swapped the hogs to one of the Futrell boys for whisky? A. Yes, sir. Q. In reply to that did you tell Cal Simpson that that sort of testimony wouldn't do because you had bought Mitchell Plant's hogs? A. Yes, sir, I told him, I says, Cal, that is too far back for evidence. We bought those hogs, you bought those hogs and I bought all she had, I come along later and bought all she had about two years ago, and I said, Cal, them hogs won't work in that case. Then I says, It ain't going to help no how. I wouldn't come out with that evidence."

Quite a bit of evidence was offered by the state and the defendant which it is unnecessary to review. The case of Davis v. State, 7 Okla. Cr. 322, 123 P. 560, 563, is one very similar to the case at bar. In that case the court said:

"The possession of property, recently stolen, is evidence against the accused, which, like all other evidence, is to be taken and considered by the jury in connection with the other evidence in the case. Mr. Bishop says:

" 'When the fact of a theft has been shown, and the question is whether or not the defendant committed it, his possession of the stolen goods, either sole or joint with others, at a time not too long after the stealing, is a circumstance for the jury to consider and weigh in connection with the other evidence. Its significance will vary with its special facts, and with the other facts of the case, among which are the nearness or remoteness of the proven possession to the larceny, the nature of the thing as passing readily from hand to hand or not, what explanations he made on it being discovered that he had

the goods, together with such other facts as ought reasonably to influence a juror's opinion.' 2 Bish. New Cr. Pro. par. 740.

"A question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence. There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testify before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not. When a jury returns a verdict of guilty in this character of a case, it indicates that the explanation of the defendant's possession, no matter how plausible, was not believed by the jury; and, unless upon a fair consideration of all the facts and circumstances in evidence, it appears that the jury were not governed by the evidence in their finding, the verdict will not be disturbed on the ground of insufficiency of the evidence."

And in the case of Starr v. State, 7 Okla. Cr. 574, 124 P. 1109, 1110, a companion case to the Davis Case, the court said:

"It was shown that these cattle all ran together on the same range, and were all taken at the same time. The evidence objected to was a part of the res gestae, and was admissible to negative the idea of a mistake and to prove the intent with which the cattle were taken."

From what has been stated, it will be seen that the facts in the instant case come squarely within the exceptions to the general rule as above indicated. The facts were that all of the hogs covered by both cases Nos. 2779 and 2780 were the property of the prosecuting witness, Bobo Smith, and this must be taken as true, from the findings of the jury. They were taken from the same range, at the same time, from the same owner, and all of the facts were so connected that it was really one larceny, regardless of the fact that defendant may have disposed of one of the hogs, known as the "Whitten hog," to a different party. As a matter of fact, the defendant, under the facts

of the case, should only have been charged with one offense instead of two. Under these facts there is no doubt but that a prosecution of case No. 2779 is a bar to the successful prosecution of case No. 2780, and that defendant would have the right to plead former jeopardy in that case. If these hogs were stolen at the same time, and it was a single transaction, involving the same parties, the state would not have the right under the law to divide the cases, and prosecute the defendant on separate cases for each hog stolen. The record does not reveal what disposition has been made of case No. 2780, but from what we have above stated we presume the same will be dismissed if it has not already been disposed of, and the defendant will not be tried upon that offense.

In the trial of this case the court, by instruction No. 6, limited the purpose for which the evidence above referred to was to be considered by the jury, and they were instructed that the evidence in question was admitted for the purpose of showing intent on the part of the defendant, and for the purpose of identifying the hog with which the defendant was charged with stealing, and could not be considered by the jury for the purpose of showing or proving the defendant stole the hog in question, and the court further instructed the jury "you should be careful to exclude from your consideration any testimony other than that which tends to show that the defendant stole the hog with which he is charged in the information." Under the facts in the case the defendant could not have expected any fairer charge. The facts proved were clearly a part of the res gestae, and under the rules of law above announced were clearly admissible.

For the reasons above stated, the judgment of the district court of McCurtain county is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.