Rex Talmadge JONES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12501.

Criminal Court of Appeals of Oklahoma.

Jan. 22, 1958.

O. C. Lassiter, Tulsa, Dick Jones, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The defendant, Rex Talmadge Jones, was charged in the district court of Tulsa County with the violation of the narcotic laws of the State, to-wit: 63 O.S.1951 § 408. He was tried before a jury and convicted, but the jury left the punishment to be assessed by the court, who imposed a sentence of two years in the Oklahoma State Penitentiary, and a fine of $500.

For reversal numerous specifications of error are advanced, as will hereinafter appear.

It is first urged that the information was insufficient to state an offense under the laws of Oklahoma. The pertinent portion reads:

"* * * that Rex Talmadge Jones on the 1st day of October, A.D.1956, in Tulsa County, State of Oklahoma, and within the jurisdiction of this court, did unlawfully, wilfully, wrongfully and feloniously, sell and dispense 12 ounces of paregoric to one person, paregoric being a narcotic, within a 48 consecutive hours period, said 12 ounces of paregoric containing in excess of four grains of opium, contrary to the form of the statutes", etc.

The basis for prosecution is contained in the provisions of 63 O.S.1951 § 408, which are rather lengthy and may and should be read. Sufficient to say, this statute prohibits selling at retail any medical preparation that contains in one fluid ounce more than two grains of opium, or to furnish any one person, within any 48 consecutive hours, any preparation containing more than four grains of opium, except as provided by such act.

Counsel for defendant argues that "another statute of equal or greater importance which was overlooked by the prosecution, and not called to the attention of the trial court, was one adopted in 1955 which in effect substituted the federal rules and regulations regulating narcotic drugs for the laws of Oklahoma".

This Act may be found as Tit. 63 O.S. 1957 Supp. § 425, and reads:

"In order to accomplish effective enforcement of the Uniform Narcotic Drug Act of Oklahoma (63 O.S.1951 Sections 401 to 424, as amended by Chapters 10a and 10d, Title 63, Oklahoma Session Laws 1953), the rules and regulations of the Secretary of the Treasury of the United States heretofore prescribed under authority of Public Law No. 729 of the Eighty-third Congress of the United States, relating to oral prescriptions of defined narcotic drugs and compounds, shall have full force and effect in Oklahoma as laws thereof. Laws 1955, p. 358, § 1."

As we view the matter, the 1955 provision above quoted could not have the effect of supplanting or limiting the plain provisions of Section 408 of the Title, but the rules and regulations of the Secretary of the Treasury of the United States that were prior to the 1955 provision prescribed under authority of Public Law No. 729 of the Eighty-third Congress of the United States, 26 U.S.C.A. (I.R.C.1954) §§ 4704(b)(1), 4705(c) (1, 2), 4724(b) (5), 4773, relating to oral prescriptions of defined narcotic drugs and compounds, would have full force and effect in Oklahoma as an aid in the enforcement of the provisions of 63 O.S.A. §§ 401–424.

The rules and regulations of the Secretary of the Treasury do not appear in the record. They are not quoted in the statute, and apparently were not relied on by the State, and counsel for the State in his brief denies any knowledge of what the rules and regulations of the Secretary of the Treasury of the United States with respect to narcotics purports to set forth. The defendant did not tender in evidence the rules and regulations in question. Under the state of the record, no further consideration will be given to such rules and regulations.

It seems to us that counsel should be able to rely on the constitutional provisions and statutes, State and Federal, to determine what the law is and that where regulations and rulings of a department of the State or Federal government are relied on, the party pleading must prove them. Which is to say, if the State had plead a violation of the regulations in question in connection with 63 O.S.1951 § 408, then the State would have been called upon to prove the germane provisions of the regulations, if any. While on the other hand, if the defendant felt that the regulations would be beneficial to his defense, he should

have tendered in evidence, after proper identification, such provisions as he felt germane to his defense.

The information tends to allege a violation of 63 O.S.1951 § 408, but the defense claims that in order to have charged defendant with the violation of the provisions of the section of the statute mentioned, the information must have alleged the name of the person to whom accused made the sale, or if the name were unknown, that fact should have been stated; and it is also argued that the consideration for the alleged sale, and a delivery, should have been stated.

■ We note that defendant did not demur to the information; but that the sufficiency thereof was first challenged by an objection to the introduction of evidence. Under authority of Huckaby v. State, 22 Okl.Cr. 376, 211 P. 525, this was sufficient.

As applied to intoxicating liquor cases the questions here raised as to the sale of narcotics early received the attention of this court in a number of cases. See: Weston v. Territory, 1 Okl.Cr. 407, 98 P. 360; Fletcher v. State, 2 Okl.Cr. 300, 101 P. 599, 23 L.R.A.,N.S., 581; Banks v. State, 2 Okl.Cr. 339, 101 P. 610; Smith v. State, 4 Okl.Cr. 328, 111 P. 960.

In the Fletcher case above, Judge Furman in great detail reviewed the authorities covering the questions presented, and that case may and should be referred to. The conclusion reached was that "An indictment or information for a single sale of intoxicating liquors must allege the name of the person or persons to whom such sale was made. If the names of such persons are unknown, then this fact must be stated."

■ The reason supporting the rule is that the statute makes each act of selling a crime. (Tit. 37 O.S.1951 § 1, intoxicating liquor, as is so in case of narcotics, 63 O.S. 1951 § 408.) And it is proper that the act charged be so described as to identify it from other acts of a similar kind as nearly as practicable, and that this can be done by giving the name of the vendee if known, or, if unknown, to so allege. And while it is true, as urged by the State, that a crime may be defined in the language of the statute, there must be enough additional descriptive averments so as to enable the defendant to prepare his defense and plead jeopardy if again charged with the same offense. The same principle treated in the Fletcher and other cases involving the sale of intoxicating liquors, is involved in the sale of narcotics, and the conclusions reached in Fletcher v. State, supra, must apply herein.

■ The matter of the consideration paid or promised by or in behalf of a purchaser to or in behalf of a seller, and a delivery of the thing sold is a matter of proof. See Maladin v. State, 72 Okl.Cr. 80, 113 P.2d 201; Littke v. State, Okl.Cr., 300 P.2d 684; Walker v. State, Okl.Cr., 270 P.2d 1107.

■ We conclude, therefore, that the information by reason of failure to set out the name of the purchaser of the narcotic preparation containing in excess of four grains of opium within a forty-eight consecutive hours period was materially defective, and the objection to the introduction of evidence on the ground of the insufficiency of the information in respect indicated should have been sustained, and amendment could have made instanter, and without a continuance, unless good cause shown to the contrary.

It is argued that the trial court committed error in permitting testimony to be taken in the absence of the defendant after the casemade had been certified by the court reporter and the trial judge, which testimony was permitted for the purpose of contradicting and impeaching the certified record. The State takes issue. But in that the case must be reversed for a new trial by reason of defective information, the matter complained of would not happen again, and treatment here would serve no useful purpose.

It is next urged that "The court erred in refusing to give defendant's requested instruction, and in refusing to give any instruction upon entrapment"; and, "The

court erred in failing and refusing to give an instruction upon defendant's theory of the case."

These assignments are argued together.

F. E. Ford, witness for the State, testified that he was a resident of Tulsa, that several years prior he had been addicted to the use of narcotics; that on about August 30, 1956 he saw Mr. Arnold Mosely of the narcotics enforcement division of the Attorney General's office, at First and Main Streets, Tulsa, and that he accompanied Mr. Mosely to the Bliss Hotel; that Mr. Mosely gave him some bills or paper money, after taking down the numbers that were on the bills, but that Mr. Mosely had first searched witness, before giving him the money which totalled $60, and they proceeded to Sand Springs, which is located in Tulsa County, and witness was to attempt to purchase narcotics at the Jones Drug Store. Witness said that he had never been in that place before. He further stated that he met the proprietor, Rex Talmadge Jones, and had a conversation with him; that this was between 8 and 9 P.M. on August 30, 1956. Said he:

"Q. After you went in the Jones drug store, did you see the defendant, Rex Talmadge Jones? A. Yes.

"Q. Did you have any conversation with him? A. Well, I asked him for something to help me, that I was a drug addict, that I was sick.

"Q. What did he say to you? A. He said, 'I will let you have an ounce of paregoric'.

"Q. Did you buy an ounce of paregoric? A. No, sir.

"Q. And why not? A. He only offered me an ounce, and I said that wouldn't be enough for me, it wouldn't be a drop in the bucket.

"Q. Was any other conversation had between you and Jones that first time? A. No, I started out, and he said, 'You come back, sir.' "

Witness said that after this he went out to the car, which was occupied by Mr. Mosely and Mr. Curtiss Greer, and reported to them.

Witness stated that following this and on September 4, 1956 he met Mr. Mosely at the Bliss Hotel, Tulsa, and that Mr. Mosely searched him, then examined some bills and recorded the numbers, and gave the money to witness for the purpose of purchasing paregoric at the Jones Drug Store in Sand Springs. That they left for Sand Springs about 8:30 P.M., and on arriving there he immediately went into the Jones Drug Store and told Mr. Jones that he was sick and had to have something to help him. That Mr. Jones said that he would let him have some paregoric, and did deliver to him about five ounces of liquid for which he paid Jones $2.10. Witness pointed out the defendant as the person who had sold him the liquid. He said that defendant did not require him to sign any kind of register or record when he received the liquid. He said that defendant said to him, "Come back, sir."

Witness said that he met Mr. Mosely outside the drug store and delivered the liquid to him, and they returned to the Bliss Hotel where the bottle was labelled and witness signed his name on the label. He identified the bottle, which was received in evidence.

Witness testified that on September 10, 1956 at about 8 P.M. he again contacted Mr. Mosely at the Bliss Hotel, was searched and then furnished $60 in currency, after the numbers on the respective bills were recorded, and he again was driven to the Jones Drug Store, in Sand Springs, accompanied by officers Mosely and Greer. He said that Mr. Jones, the defendant, at that time sold him six ounces of what was supposed to be paregoric, but told him that he would have to charge him one dollar an ounce, and he paid him; that the liquid was in a six-ounce bottle without label and that he was not required by defendant to sign a record or register. He said that defendant admonished him: "Now, if I get fined for selling you this paregoric, you will get fined too, sir."

Witness said that following this he went outside and delivered the liquid to Mr. Mosely and they returned to the Bliss Hotel, Tulsa, where the bottle was labelled and marked as in the other purchase. Witness identified this bottle and it was received in evidence as State's exhibit No. 2.

The above procedure was repeated on September 24, 1956, except at this time defendant sold witness eight ounces of what was supposed to be paregoric for $8, after witness told defendant that six ounces of paregoric was not enough. This purchase was received in evidence as State's exhibit No. 3.

The procedure was again repeated on October 1, 1956, except this time when witness asked for paregoric, defendant asked witness, "How much?", and witness said, "Well, let me have as much as you can." Witness was asked, "What did he say to that?" And answered: "Well, he says, 'I can give you this bottle full for $12.'" Witness said he gave defendant $12, and went outside and gave the bottle to Mr. Mosely, and Mr. Mosely and deputy sheriff Bliss then entered the drug store. After this they returned to the Bliss Hotel where the bottle was labelled as in the other cases. This bottle of liquid was received in evidence as State's exhibit No. 4.

On cross-examination witness Ford admitted that he often worked with the narcotics division of the Attorney General's office, aiding in apprehension of persons selling narcotics, and got a fee of $10 each time. He admitted that he had been an addict several years before, and had drunk paregoric and had cooked it or boiled it down; that when boiled down it can be "shot". Witness said that the first time he talked with defendant at the Jones Drug Store he told defendant that he was a drug addict, and that he told defendant that each time he made a purchase. He denied that he went through the agony of a person who needed some morphine, or that he put on any act. He admitted that the defendant refused to sell him morphine, and one time he refused to sell him tablets.

Arnold Mosely, narcotic enforcement agent of the State Attorney General's office, testified to seeing F. E. Ford at First and Main Streets, Tulsa, on August 30, 1956, and employing him to aid in discovering narcotic sellers. He testified to furnishing money to Ford to make purchases, and to driving Ford to Sand Springs to the Jones Drug Store the times Ford testified about. He testified to searching Ford for narcotics prior to each occasion, and searching him after he would come out of the drug store. As to the sale on October 1, 1956, witness said that when Ford came out he handed him a 16 ounce brown bottle, with plastic cap, that contained a brown solution. Witness and deputy sheriff Bill Bliss then entered the drug store and asked defendant if he had a prescription for the paregoric that he had just sold, and defendant denied having sold any paregoric; that witness then asked to see his exempt narcotic register and finding no entry took possession of it. The register was received in evidence as State's exhibit No. 7, and did not show a sale made on October 1, 1956 to F. E. Ford. Defendant was placed under arrest and asked to produce the money that he had just received in payment of the paregoric that he had just sold, and defendant reached in his left hand trouser pocket and removed two five dollar bills and two one dollar bills. He said that the numbers on the bills corresponded to the memorandum receipt that he had from Ford, and that this money was part of the money that he had furnished Ford. The money was received in evidence.

Taylor Rogers, chemist for the State Crime Bureau, testified to making a chemical analysis of the fluid contained in each of the bottles marked State's exhibits Nos. 1, 2, 3, and 6. He said that he used United States pharmacopeia 14 method of assay for morphine and also to determine the alcoholic content, and that each fluid ounce contained 1.9 grams of opium and also 45 or 46 per cent alcohol. He said the paregoric contained approximately 1.9 grains per fluid ounce. He testified that State's exhibit No. 6 contained about 30.4 grains of opium in the pint bottle.

Curtiss Greer, enforcement officer, for the State Board of Pharmacy testified substantially as officer Arnold Mosely. He said that he was present each time F. E. Ford was given money by Mr. Mosely for purchase of narcotics, saw Ford searched prior to going on his missions, and he said that he as well as Ford initialed the State's exhibits, and he identified State's exhibits Nos. 1, 2, 3, 4 and 6.

Mr. Arnold Mosely was recalled and asked if he knew what exempt narcotics were, and answered: "Exempt narcotics are those drugs which are compounded and may be sold within certain limits of the law without a doctor's prescription." He said that he learned the definition from Title 63 O.S. 1951 § 408-A.

This completed the evidence for the State.

The defendant, Rex Talmadge Jones, testified. He said that he was 29 years of age, and had lived in Sand Springs about two months and had opened the Jones Drug Store in Sand Springs February 25, 1956. He said that he had a ninth grade education, and did not have a pharmacist's license, but employed a pharmacist, and two girl clerks to aid him in his business.

Defendant admitted that State's witness Ford had been in his store trying to buy things. He said that Ford complained of being very sick at his stomach. He denied that Ford ever told him that he was a drug addict. And as to the sale of paregoric to Ford on October 1, 1956, the sale he was charged with in the information, defendant testified:

"He come in and I asked what he wanted. He said, 'I want to talk to you a minute'. I said, 'all right'. And he said, 'Man, I am sick'. I said, 'What is the matter?' He said, 'I still got diarrhea'. He said he had diarrhea all the time, and all nervous and looked like he was in pain. I told him, 'I am not a doctor', but that was his trouble, he said. He had been getting some along and he said it was just not enough to do him any good, and he kept on asking

for more, and I told him what I would sell him the amount for.

"Q. I believe for the amount of $12? A. That is correct."

Witness said that Ford tried to purchase morphine from him but that he told him that he ought to run him out of the store, and Ford then asked for paregoric. Said he:

"A. Well, he asked me would I sell him more than I had been selling him. He said he couldn't get rid of this, he had to have it, and would I sell him something else and quiet him down, and I said I wouldn't. I didn't know anything about that."

He said that he knew that paregoric contained a small amount of narcotics, but did not know how much.

On cross-examination witness was shown a paregoric label, and admitted that it stated the amount of opium contained in the solution. He admitted that he had a book for the purpose of keeping a record of paregoric sales, but did not know the law required it. Witness admitted that he had never entered a record of a sale of over two ounces of paregoric. He said that he did not have a standard rate for the sale of paregoric, but got from 35¢ an ounce to $1 an ounce. He claimed that he raised the price on Ford trying to get rid of him. Witness admitted that he was convicted of a crime when he was sixteen years of age, but said that he served no time. He denied that he ever made a statement to Ford that if witness got fined for selling paregoric that Ford would also get fined.

A number of witnesses were offered by the defense to show the good character of Jones in the community in which he lived.

We have carefully studied the instruction offered by the defendant covering entrapment, but do not find that the court erred in refusing to give such requested instruction, or any other instruction covering entrapment, as we shall attempt to demonstrate hereinafter.

Assuming for purpose of argument only that it was proper for the State to show the various sales to Ford of paregoric prior to the sale charged on October 1, 1956, if the defendant had let the decoy Ford have more than two ounces of paregoric on his first call on August 30, 1956 there would have been a serious question of entrapment, because Jones would not sell the requested morphine, though, according to Jones, Ford feigned pain and illness, claiming diarrhea, though Ford denied this and claimed that he told Jones that he was a narcotic addict and sick and never claimed that he had diarrhea. But the evidence, if the charge had been based on a sale under such conditions, undoubtedly would have required an instruction on entrapment. The persistence of Ford calling on Jones over a period of a month would dispel any idea of an emergency of a sudden illness and pain that would lure the defendant into letting Ford have over two ounces of paregoric and thereby committing a crime which but for Ford's subterfuge he would not have committed.

This court has many times considered the question of entrapment. See Warren v. State, 1926, 35 Okl.Cr. 430, 251 P. 101; Rider v. State, 1932, 53 Okl.Cr. 393, 12 P.2d 552; Lee v. State, 1939, 66 Okl.Cr. 399, 92 P.2d 621; Finley v. State, 1947, 84 Okl.Cr. 309, 181 P.2d 849; Beasley v. State, 1955, Okl.Cr., 282 P.2d 249. See also Sorrells v. U. S., 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 260; 15 Am.Jur. p. 24, § 335.

■ In the case of Lee v. State, supra, we said, paragraphs 4, 5 and 6 of the syllabus:

"Where the doing of a particular act is a crime regardless of the consent of any one, if the criminal intent originates in the mind of the defendant, the fact that peace officers furnished an opportunity for or aid in the commission of the crime, in order to secure the evidence necessary to prosecute him therefor, constitutes no defense.

"Entrapment is the planning of an offense by an officer, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trickery or fraud of the officer.

"Ordinarily, it is not against public policy for peace officers or persons acting under their direction to set a trap for one suspected of planning the commission of a crime, and if he commits the crime, even though encouraged by the officers or persons acting under their direction who laid the trap, the fact that he was so entrapped will be no defense."

■ What appears to us as a clear discussion of the law of entrapment as applied to dispensers of narcotics is contained in the case of Vaccaro v. Collier, D.C., 38 F.2d 862, 870, where the court said inter alia:

"It becomes necessary to understand fully what is meant by entrapment, and to what extent it may be resorted to. Whenever an officer of the law, by any plan or contrivance, causes a person to commit a crime, such official is said to entrap such person. We may assume that the particular offense would not have been committed except for the act of the officer. Nevertheless, if the person so entrapped was known to have, or was reasonably suspected of having, violated the law, such conduct on the part of the officer is lawful. Thus the apprehension of persons through decoys, through opportunity afforded to sell whisky, narcotics, or to do other illegal acts, has been generally upheld. Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550; Newman v. United States, 4 Cir., 299 F. 128; Hummelshime v. State, 125 Md. 563, 93 A. 990, Ann.Cas. 1917E, 1072. On the other hand, officers of the law may not induce persons, who it is not reasonable to suppose would otherwise violate the law, to do so, and then prosecute them. Public policy and fair play forbid going to such an extreme. The question, therefore, is always one of degree. A

suspected person may be tested by being offered opportunity to transgress the law in such manner as is not unusual, but may not be put under any form of extraordinary temptation or inducement. Thus, since a morphine dealer usually deals with addicts, an officer, in testing such a supposed dealer, may properly pretend to be an addict, with such a person's common discomforts and craving for the drug, thereby giving color to the ruse, and he may offer a liberal price for the drugs and manifest persistence, for these things are common in such dealings. Similarly, when one is suspected of selling intoxicating liquor in violation of the law, the officer may represent himself as a customer and may do and say such things as would not be unusual in such a situation."

This case was on appeal modified on other features of the case by the Circuit Court of Appeals, Fourth Circuit, 51 F.2d 17.

■ Our conclusion, stated at the outset, that the court did not err in failing to give an instruction on entrapment, however, is based wholly on the allegations contained in the information as to the sale alleged to have been made on October 1, 1956 where a sale of 12 ounces of paregoric was admittedly made, and where by no stretch of the imagination could it be claimed that defendant was enticed and lured by chicanery and fraud on the part of the decoy Ford into selling him an excess of paregoric to relieve a stomach disorder, such quantity being much in excess of that necessary for such purpose, even if Ford did have diarrhea.

The defendant as the owner of a drug store and licensed to sell narcotics and preparations containing narcotics, is held to know the law concerning the dispensing of such preparations, and admittedly violated the provisions of 63 O.S.1951, and particularly § 408.

The final proposition necessary for disposition of this case is the specification that:

"The court erred in admitting evidence of alleged separate and distinct offenses, wholly disconnected from the alleged offenses set forth in the information. If such evidence was admissible, the court denied accused a fair trial by failing and refusing to instruct the jury as to the limited purpose for which such evidence was admitted and restricting their consideration of such evidence to the limited purpose for which it was admitted."

■ This specification of error has presented difficulties. The action of the court to be upheld would require the invocation of an exception to the general rule as to the admission of evidence. The general rule is that when a defendant is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and evidence of other crimes either prior or subsequent to the offense for which he is on trial is inadmissible. The court announced that he was admitting evidence of sales of paregoric other than that alleged in the information based on the ground that such other sales were a part of the res gestae, while the Attorney General contends an exception to the rule may be supported on the basis that the sales of September 4, 10, and 24, 1956, "tended to establish a common scheme, system, method and plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other."

■ In the early case of State v. Rule, 1914, 11 Okl.Cr. 237, 144 P. 807, Judge Doyle for this court went to some length in illustrating the exceptions to the general rule stated. Then in 1939 Judge Barefoot in Michelin v. State, 66 Okl.Cr. 241, 90 P.2d 1081, cited by the Attorney General, reviewed the intervening cases; and recently (1957) Judge Nix in Roulston v. State, Okl. Cr., 307 P.2d 861, 863, has at some length reviewed the authorities on the subject. The exception to the rule was there reaffirmed in this language:

"Evidence of other crimes in order to be admissible must come within one

of the well-recognized exceptions to the rule. That it tends to establish (1) Motive, (2) Intent, (3) The absence of mistake or accident, (4) A common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and, (5) The identity of a person charged with the commission of the crime on trial."

This court has said: "As to what constitutes res gestae is possibly the most complex and difficult question in criminal law." (Price v. State, 1 Okl.Cr. 358, 364, 98 P. 447, 450.) And further, "That courts can only deal with the subject in the light of the facts of each particular case when the occasion arises." (Carnes v. State, 14 Okl.Cr. 585, 179 P. 475, 478.) But generally, it may be said that "Spontaneous declarations springing out of and contemporaneous with the principal fact sought to be proven, and which are made at a time so near to it as to preclude the idea of deliberation and fabrication, whether they be declarations of a deceased or of a defendant or of bystanders, are admissible as part of the 'res gestae'." (Clingan v. State, 15 Okl. Cr. 483, 178 P. 486, 488.) And see Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927. See also, Vol. 37, Words and Phrases, Res Gestae for illustrative cases, p. 209, 299.

From these cases, it seems that the involved testimony that would be sought to be admitted would be hearsay testimony, but such testimony would be substantially contemporaneous with the main facts under consideration, and so closely connected therewith as to illustrate its character. For an illustrative case, see Hathcox v. State, supra.

We conclude herein that evidence of sales of paregoric by the defendant to decoy Ford on September 4, 10 and 24, 1956 were each separate offenses from the sale charged to have been made on October 1, 1956, and that evidence of such sales and statements made by the defendant at such times, for such reasons, and by reason of the separation by time, could not be ad-

missible on the theory that such statements formed part of the res gestae of the sale charged as of October 1, 1956.

The argument by the State that evidence of the sales prior to October 1 were admissible as tending to establish a common scheme, system, method and plan embracing the commission of two or more crimes, so related to each other that proof of one tends to establish the other, cannot be supported by the evidence. The only scheme or plan developed by the evidence was the plan by the State to furnish money to a decoy and furnish defendant an opportunity to sell him narcotics. The decoy was the aggressive party, and the fact that defendant may have made the statement to the decoy, "You come back, sir", is not sufficient to support the idea of a scheme or plan to sell decoy narcotics.

In the Michelin case, supra, cited by the State to support its theory that the evidence in the within case of the attempted purchase of narcotics by decoy on August 30, 1956 as well as the purchases of September 4, 10 and 24, 1956, were admissible in evidence as an exception to the general rule stated in Michelin, and heretofore quoted from Roulston v. State, supra, cannot be accepted as authority for such proposition. Here, as already stated, the three prior illegal sales involved were distinct crimes each separated from the other by days in time, and in order to prove the crime charged of October 1, 1956 it did not require any evidence of the prior offenses in carrying out such burden of proof. For as said in the Michelin case, supra, [66 Okl. Cr. 241, 90 P.2d 1086] the exception to the general rule is invoked "where the evidence of the other crimes tends directly to prove defendant's guilt of the crime charged. Evidence which is relevant to defendant's guilt is not inadmissible because it proves or tends to prove him guilty of another and distinct crime. It is often the case that they are so inseparable that the proof of one necessarily involves proving the other."

In the Michelin case the defendant was charged with the larceny of one hog on

April 30, 1937 in case No. 2779, the personal property of Bob Smith, and in case No. 2780 was charged with the larceny of two hogs, likewise on April 30, 1937 and the personal property of Bobo Smith. Defendant was placed on trial in case No. 2779. For brevity we will not state the facts developed other than the conclusion of this court, where it said:

"They [the hogs] were taken from the same range, at the same time, from the same owner, and all of the facts were so connected that it was really one larceny, regardless of the fact that defendant may have disposed of one of the hogs, known as the 'Whitten hog', to a different party. As a matter of fact, the defendant, under the facts of the case, should only have been charged with one offense instead of two. Under these facts there is no doubt but that a prosecution of case No. 2779 is a bar to the successful prosecution of case No. 2780, and that defendant would have the right to plead former jeopardy in that case. If these hogs were stolen at the same time, and it was a single transaction, involving the same parties, the state would not have the right under the law to divide the case and prosecute the defendant on separate cases for each hog stolen. The record does not reveal what disposition has been made of case No. 2780, but from what we have above stated we presume the same will be dismissed if it has not already been disposed of, and the defendant will not be tried upon that offense."

The exception to the general rule is well illustrated in such cases as Bainum v. State, 45 Okl.Cr. 330, 282 P. 903, called to our attention by the defendant. There the accused was charged with the murder of a night watchman guarding a wholesale grocery establishment. Evidence of the stealing of burglary tools and guns from a hardware store the night of the homicide, the theft of a car used in the burglary and the sale of cigarettes and other items taken in the burglary of the grocery store the fol-lowing day were admitted because the evidence of the State showed that a scheme or plan had been made several days before the homicide, which called for the commission of the burglary of the hardware store to steal burglary tools and pistols to be used in burglarizing the wholesale grocery and the theft of a car, and as a part of the scheme or plan it was agreed that the cigarettes and other stolen property were to be sold to a "fence" living in Oakhurst between Sapulpa and Tulsa. This scheme or plan called for the commission of two or more crimes so related to each other that the commission of one tended to establish the other.

As stated in Byers v. State, 78 Okl.Cr. 267, 273, 147 P.2d 185, 188:

"The fact that one person may commit similar crimes does not justify the admission of other identical offenses if they are independent of each other. Where the trial court cannot clearly see a visible connection between the alleged other offenses to the one charged, he should refuse to admit the other offenses in evidence. If the trial court is uncertain as to the admissibility of such evidence, he should give the benefit of such doubt to the defendant as it is manifestly unfair to the accused to force him to prepare to defend himself against any collateral crime other than the one charged against him in the information. Juries are too prone, when such other offenses are admitted in evidence, to find an accused guilty of the crime charged merely because he might have committed some other offense."

We find no visible connection between the separate offenses of September 4, 10 and 24, 1956, and hold that evidence of such offenses was inadmissible.

For the reasons stated this case is reversed and remanded for a new trial consistent with the above expressions from this court.

BRETT, P. J., and NIX, J., concur.